NOTICE

Decision filed 06/02/23. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2023 IL App (5th) 220047

NO. 5-22-0047

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 20-CF-1145 |
| | ) | |
| DEMERIO M. HILSON, | ) | Honorable |
| | ) | Roger B. Webber, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MOORE delivered the judgment of the court, with opinion.
Justices Welch and Vaughan concurred in the judgment and opinion.

**OPINION**

¶ 1    The defendant, Demerio M. Hilson, appeals his conviction and sentence, following a jury trial in the circuit court of Champaign County, for being an armed habitual criminal. For the following reasons, we affirm.

¶ 2                          I. BACKGROUND

¶ 3    We recite only those facts necessary for an understanding of our disposition of this appeal. On October 8, 2020, the defendant was charged, by information, with one count of attempted first degree murder, one count of aggravated battery with a firearm, and one count of the offense of being an armed habitual criminal. Count I alleged that on October 4, 2020, the defendant committed the offense of attempted first degree murder when he shot Wyatt Blissit in the leg. Count II alleged that on October 4, 2020, the defendant committed a battery with a firearm against

1

Wyatt Blissit. Count III alleged that on October 7, 2020, the defendant committed the offense of being an armed habitual criminal in that he

"knowingly possessed a firearm, namely a Smith and Wesson 40 caliber pistol, after having previously been convicted of the offense of Manufacture or Delivery of a Controlled Substance, a class 1 felony, in Champaign County cause number 06-CF-1836, and of the offense of Manufacture or Delivery of a Controlled Substance, a class 2 felony, in Champaign County cause number 08-CF-558."

¶ 4      On February 9, 2021, the defendant filed a motion to sever count III, the offense of being an armed habitual criminal, from counts I and II, the offenses involving Wyatt Blissit. The motion to sever was granted, count III was tried alone by a jury, and the defendant's appeal stems from this charge alone.

¶ 5      On April 19, 2021, selection of the jury for the defendant's trial began. Opening statements were given on April 20, 2021. Immediately after opening statements were presented, the trial court read the following stipulation to the jury: "That on October 7, 2020, the defendant, Demerio Hilson, was a convicted felon, having been previously convicted of a combination of two or more of the enumerated felonies set forth in 720 ILCS 5/24-1.7."

¶ 6      Testimony began on April 20, 2021. The first witness to testify at the defendant's jury trial was James Hobson. He testified that he was employed by the Champaign Police Department and had been since 2015. At the time of trial, he was working as a detective with the street crimes task force, but on October 7, 2020, he was working as a uniformed officer in the patrol division.

¶ 7      Hobson testified that on October 7, 2020, at approximately 11:41 p.m. he was on duty, and he observed a black Ford Taurus with its lights off near Northwood Street and McKinley Avenue in Champaign. He testified that he was aware of an ongoing investigation involving a black Ford Taurus that matched the vehicle he observed as well as Demerio Hilson. Hobson testified that after

2

the Ford Taurus pulled into a private driveway, he pulled in behind it and turned on the emergency lights on his squad car. He instructed the occupants of the Ford Taurus to stay in the car while he waited for additional officers to arrive since it was a felony stop. Once additional officers arrived, Hobson instructed the occupants of the vehicle to exit one at a time. Hobson testified that a female was in the front passenger seat, was cooperative, and exited the car after being asked to.

¶ 8    Hobson testified that the defendant was in the driver's seat of the Ford Taurus. Hobson identified the defendant in court. Hobson testified that the defendant did not exit the car right away. He stated:

> "We gave him several commands to step out of the vehicle. He was adamant he didn't want to get out. He wanted us to approach him, but we didn't feel that was safe to do so. So after he refused to get out several times, we ended up calling the female out. And then once she was out and detained in handcuffs, we then called him out again, and this time he eventually did comply and get out."

The defendant was detained after he exited the car, and other officers performed a cursory search of the vehicle.

¶ 9    Hobson testified that Officer Nathanael Epling asked him to look under the driver's seat of the vehicle. Hobson observed a black handgun directly underneath the driver's seat, and he photographed it. Additionally, he photographed the car and the scene. Hobson was shown People's exhibits A1 through A14, which he identified as the photographs he took, and he testified that they fairly and accurately depicted the black Ford Taurus, including the interior and the gun located inside. The photographs were admitted into evidence, without objection, and published to the jury. While the photographs were being shown to the jury, Hobson testified as follows regarding the exhibits. He testified that exhibit A1 showed the black Ford Taurus that he pulled over in the driveway. The other car that was next to it was already parked in the driveway, and it was

3

unoccupied. Exhibits A2, A3, A4, and A5 showed the same car from different angles. Exhibit A6 showed the driver's seat of the Ford Taurus. Exhibit A7 showed the back row of seats of the Ford Taurus. Exhibit A8 showed the front passenger seat of the Ford Taurus where the female had been seated. It also showed the center console, which was a solid piece of plastic, which prevented access to beneath the driver's seat from the passenger side. Exhibit A9 showed a close-up of the driver's seat and that it was a power seat that used an electric motor and controls to adjust the seat. Exhibit A10 also showed a close-up of the driver's seat and controls. It also showed that there is no access from the rear passenger compartment to the area under the driver's seat. Exhibit A11 showed the area under the driver's seat that Hobson described as a "void." A11 showed the void, looking from the front of the driver's seat to the back underneath the seat, and the black handgun. Hobson testified the handgun had not been moved prior to taking the photograph.

¶ 10    Hobson testified that it was his responsibility to enter the handgun into evidence. He testified that to enter the handgun into evidence he first photographed it, then he collected it, and then he processed it for DNA evidence. He testified to process it for DNA he took the following steps:

> "So I use sterile cotton swabs. I use three of them. I have a small container, a plastic container that contains distilled water. I would wet each of the cotton swabs. And then with each swab, I would swab a different area of the handgun. Use one swab to swab the butt of the magazine. I would use a second swab to swab the grip of the handgun. And then the third swab, I would swab the front and rear sight as well as the slide and the trigger."

Hobson testified that he put on rubber latex gloves after taking the photographs and then removed the handgun and "swabbed the gun for DNA at the driver's side of the vehicle." He then placed the swabs into separate cardboard boxes, which then go into paper evidence bags, and then those are sent off to the state police lab.

¶ 11 Hobson testified that exhibit A12 showed the handgun that was located under the driver's seat and identified it as a Smith & Wesson, SD40, a .40-caliber handgun. He testified that it was loaded with a round in the chamber and a loaded magazine inserted into it. He was shown exhibit A13, which showed the cardboard gun box that the handgun was placed into to preserve it and send it to the lab. Exhibit A14 showed the outside of the cardboard gun box that was used to send the recovered handgun to the Illinois State Police Forensic Science Laboratory. Hobson was shown People's exhibit G, which he identified as the actual box that he sent the handgun in to the state police lab and the submission sticker with his name on it. He testified that the box looked the same as the photograph he had viewed. Hobson opened the box, viewed the handgun, and testified that it was in substantially the same condition at the time of trial as when he located it under the seat on October 7, 2020. Exhibit G was admitted into evidence, and Hobson showed it to the jury. He testified that the handgun was under the seat with the handle towards the front of the seat and the barrel facing away from the steering wheel. Hobson testified this was the extent of his role in the investigation.

¶ 12 On cross-examination, Hobson testified that he was wearing a body camera on October 7, 2020, and he activated it once he realized it was not turned on. He testified that he believed he turned on the body camera after the occupants of the vehicle had been detained in handcuffs.

¶ 13 Hobson testified that when he exited his squad car, he drew his duty weapon and had it in the high ready position, which involves holding the weapon high, but pointed down so that it is not pointed at anyone. At this time, he was approximately 20 feet from the defendant, and he was able to talk to him by raising his voice. Hobson wanted the defendant to exit the vehicle, and the defendant wanted Hobson to come to the car.

5

¶ 14    Hobson testified that an Illinois temporary registration was displayed on the rear of the vehicle. He testified that he ran the registration at some point, but he did not recall who it came back to as the owner.

¶ 15    The front seat passenger, Tylor Lattimore, exited the vehicle. She was not arrested, and no one collected her fingerprints or DNA. After speaking to officers, she was released.

¶ 16    Once the defendant was taken into custody, the vehicle was towed to the Champaign Police Department. Once it was there, the vehicle was further processed for evidence due to its reported involvement in a separate investigation.

¶ 17    On redirect examination, Hobson testified that the entire incident was recorded by the camera located in his squad car.

¶ 18    Nathanael Epling was the next witness to testify. He testified that he was a patrol officer with the Champaign Police Department and had been since 2007. Epling testified that he was on duty on October 7, 2020, at approximately 11:45 p.m. when he was called to 1205 Paula Drive for an ongoing investigation. Upon arrival, Epling observed that Hobson had a black vehicle pulled over in the driveway of the residence at 1205 Paula Drive. He testified that he assisted Hobson with the removal of the occupants from the vehicle.

¶ 19    After the occupants had exited the vehicle, Epling conducted a quick search of the passenger compartment of the vehicle. He testified that he began by looking at the driver's seat and that he did not locate anything in or above the driver's seat, but he did see what he thought to be a handgun under the driver's seat. He notified Hobson of the handgun.

¶ 20    Epling was shown exhibit A9, which he confirmed was a photograph of the driver's seat. He was also shown exhibits A10 and A11, which depicted what he saw under the seat. Epling testified he was using a flashlight in his left hand when he was looking in the vehicle. He testified that he did not have to touch anything inside the vehicle to locate the handgun.

6

¶ 21    Epling testified that to his knowledge, no one touched the handgun, other than Hobson when he swabbed the handgun and collected it as evidence. The photographs show how it looked, and it had not been altered or moved.

¶ 22    The only cross-examination of this witness was inquiring as to whether he wrote a report. Epling testified that he did not write a report.

¶ 23    Corey Phenicie was the next witness to testify. He testified that he was a detective with the Champaign Police Department and had been for approximately 13 years. Phenicie testified that he was aware of Hobson stopping a black Ford Taurus on October 7, 2020, and his role was to maintain the evidence that was collected as a result of that stop.

¶ 24    He testified that the swabs that were taken at the scene were packaged and kept at the Champaign Police Department in accordance with evidentiary standards as well as the buccal swab collected from the defendant. Phenicie testified regarding the process of collecting the buccal swab from the defendant and then sending it to the crime lab.

¶ 25    He testified that, in this case, he sent to the crime lab the handgun that was placed into the cardboard gun box, the swabs that were taken from the handgun, and the swabs from the defendant.

¶ 26    On cross-examination, Phenicie testified that he did not collect any DNA samples from anyone else in this case.

¶ 27    The next witness was Kelly Maciejewski. Maciejewski testified that she is employed as a forensic scientist for the Illinois State Police Forensic Science Laboratory in Springfield and had been employed there since 2001. She testified that she specifically worked within the biology and DNA section.

¶ 28    Maciejewski testified regarding her educational background and training. She has a bachelor of arts degree in biology and English, a master of science in forensic science, and has completed an approximately two year training program with the Illinois State Police specific to

7

the areas of forensic biology and DNA testing. She testified that she works at the Illinois State Police Forensic Science Laboratory in Springfield and that it is an accredited lab subject to examination and accreditation every two years.

¶ 29 Maciejewski was tendered and accepted as an expert in biology and forensic DNA analysis. Following the expert finding, the trial court read the following stipulation to the jury:

"The parties hereby stipulate as follows: At all times the below referenced exhibits were handled as is required to maintain the evidentiary and forensic value of the exhibits and were protected from tampering and contamination. The exhibits were sent to the Illinois State Police Crime Laboratory to determine the presence or absence of DNA and the donor of such DNA, if possible.

The duties of forensic scientists employed by the Illinois State Police include the analysis of items submitted to the Illinois State Police Springfield Forensic Science Laboratory to determine the presence or absence of DNA material on said items and to determine, if possible, the donor of said DNA. People's exhibits referenced below were analyzed to determine the presence or absence of DNA and to identify the contributor of that DNA, if possible.

As to People's Exhibit G, a .40[-]caliber Smith & Wesson handgun, portions of the gun were swabbed for the possible presence of DNA.

People's Exhibit L1 is the DNA buccal swab obtained from inside of the defendant's mouth by Officer Cory Phenicie on February 11, 2021. This swab was used by the forensic laboratory to compare with DNA samples recovered from Exhibit G, the handgun.

People's Exhibit L2, a swab of the handgun grip, was tested and the mixture of human DNA of at least three individuals was extracted by analyzing the sample. One major male contributor was identified in the sample.

Kelly Maciejewski is a forensic scientist employed by the Illinois State Police. Her duties include the analysis of items submitted to the Illinois State Police Springfield Forensic Science Laboratory to determine the presence or absence of DNA material on said items and to determine, if possible, the donor of said DNA. Based upon her education, training, and experience, she would be qualified as an expert witness in the field of Criminal Forensic DNA analysis. All procedures used in her analysis are generally accepted in her field of expertise. She analyzed the DNA extractions from People's L1 and L2 to determine the presence or absence of DNA and to identify the contributor of the DNA, if possible.

That concludes the stipulation, and you should consider that the same way that you consider any other evidence admitted in this case."

Following the stipulation, People's exhibits L1 and L2 were admitted into evidence without any objection.

¶ 30    Maciejewski explained DNA to the jury. She testified that

"DNA stands for deoxyribonucleic acid. And it's essentially the building block of life. It's what distinguishes us from other animals. It's what makes us all human. Most of our DNA within our bodies is the same as each other; however, there are, of course differences, which is what makes us unique from one another."

She testified that DNA is in every cell within the body.

¶ 31    She testified that the lab has a multi-step procedure to analyze DNA. First, the DNA must be extracted from the swab or item. The second step is quantitation to determine how much DNA

9

was recovered. Third is amplification to make exact copies of the recovered DNA. The final step is "DNA profiling, which is getting you the DNA profiled that you were able to recover from that sample." She testified that these processes are well-documented and accepted in the forensic community.

¶ 32    Maciejewski testified as follows regarding degraded DNA:

"Q. So [DNA] can be found in an almost complete form but also degraded down to where you can't even recognize it; is that fair to say?

A. Yes. So DNA—and you may be familiar or not with it's sort of shaped like a ladder, like a twisted ladder, and so it's in a long strand. And basically time, dirt, exposure to environmental conditions, things like that can break the strand apart. And that just means kind of chop it into bits, almost. And so the DNA is still there, it's not changed. It's just that it is damaged or broken down.

So we test 23 areas of DNA. If you have a sample that is degraded or broken down to some extent, you may not get all 23 areas. You may only get a portion of that, and that's due to degradation."

¶ 33    Maciejewski testified that we are constantly shedding DNA because our skin contains cells, so anytime you touch something, you leave behind DNA. DNA is also contained in our blood and saliva. She testified that if someone picked up a pen, their DNA would be left behind. The DNA on the pen could also degrade if dirt, or another person, touched the pen. She testified that if multiple people have left behind DNA on an object, it can still be extracted and separated.

¶ 34    Maciejewski testified that she was assigned to a case involving the defendant. She testified that her role was to conduct the DNA profiling between the buccal swab collected from the defendant's mouth and the results of the swabs collected from the handgun. She testified that in this case, she determined that there was a mixture of DNA, from at least three individuals, present

10

on the grip of the handgun. She testified that from the grip, there was one contributor that was higher in concentration, so she was able to separate out that DNA profile for that major contributor at 8 of the 23 locations. She compared this to the buccal swab and determined the defendant was included as a possible contributor to that major DNA profile from the grip of the handgun. Maciejewski testified that for this sample, for the eight-locus major contributor, you would see that profile in approximately 1 in 450 billion individuals.

¶ 35 On cross-examination, Maciejewski testified that she could only say that the defendant was included as a potential contributor of the major DNA profile, not specifically that it was his DNA. On redirect examination, she testified,

"When I say [the defendant is] a possible contributor, I'm just saying that the types that I have generated for the major profile, [the defendant] is included and has those same types. I can't tell you if it's him or if it could potentially be someone else. The statistics speak for that."

¶ 36 Next, Hobson was recalled as a witness. He testified that the encounter with the defendant was recorded by the camera in his squad car and confirmed that the video, People's exhibit V1, fairly and accurately depicted the interaction with the defendant. Exhibit V1 was admitted into evidence without objection. The jury was then instructed that the video they were going to watch, exhibit V1, had been edited due to pretrial rulings and that they should not be concerned about what was not shown and only consider what is in the video. The State then rested its case.

¶ 37 The defendant then testified as a witness on his own behalf. He testified that when he was stopped by police at the house on Paula Drive that he did not exit the vehicle like they wanted him to because

"I was on the phone calling my cousin to let him know that I was getting pulled over. And then the other reason, the female passenger was yelling hysterically about not getting out

11

of the car, talking about they were gonna shoot me or—because when they got out, they had their guns out. So I was a bit nervous myself."

¶ 38　The defendant testified that his cousin, Caleb Hope, owned the vehicle he was in and that Hope resided at the house on Paula Drive. The defendant testified that he had borrowed Hope's car to pick up his friend and that he was only supposed to have the car for about 20 to 30 minutes, but he had kept it for a couple of hours.

¶ 39　The defendant testified that he did not inspect the car before driving it and did not know there was a gun under the seat. He also testified that the gun under the seat was not his.

¶ 40　On cross-examination, the defendant was asked how his DNA was on the gun. He responded, "I can't explain. I have no idea." He testified that he never possessed that gun. He also stated, "Somehow it got on there. I don't know if I dropped my phone under the seat—and reached for it."

¶ 41　The defendant testified that he borrowed the car to pick up a female friend. He testified that he had blocked his cousin from calling him because he had kept the car longer than the 20 to 30 minutes he was to have it. He testified that he was just "riding around out in the country." He testified that he and his female passenger were drinking inside the car. He again testified he did not know a gun was in the car.

¶ 42　The defense then rested. The defendant moved for a directed finding of acquittal, which was denied. A jury instruction conference was then held. There were no objections made to proposed instructions that are relevant to this appeal. The defendant did not tender any alternative instructions.

¶ 43　Following closing arguments, the jury retired to deliberate at 2:27 p.m. At 3:07 p.m., the trial court was back on the record, outside the presence of the jury, because the jury had submitted the following question: "Are we deciding did he have possession of the gun at the time of arrest

12

or any time before this arrest?" The following exchange took place between counsel and the trial court:

"THE COURT: What are your thoughts? There is an IPI about the specific date, but I don't know that that really—

MR. LARSON: I don't know that IPI off the top of my head, but if it can answer their question, I think we all want to try to answer it so that we can go home at some point.

\* \* \*

THE COURT: So 3.01—IPI 3.01 says, 'The information states that the offense charged was committed on October 7th, 2020. If you find the offense charged was committed, the State is not required to prove that it was committed on the particular date charged.'

MR. LARSON: Well, I would argue that we should give that to them because it appears to answer their question.

THE COURT: Mr. Dedman?

MR. DEDMAN: It's so true that it does, but shouldn't I object? I object.

THE COURT: All right.

MR. DEDMAN: It does answer the question.

THE COURT: Do you want to elaborate on the objection or?

MR. DEDMAN: No. It's just I feel like I should object because I don't have—

THE COURT: All right. We'll prepare that IPI—

MR. DEDMAN: I sense how this is going.

THE COURT:—and that will be the answer that we send back."

¶ 44    The question was answered, and the jury continued deliberations. The jury thereafter found the defendant guilty of being an armed habitual criminal.

13

¶ 45    On June 17, 2021, the defendant was sentenced to serve 24 years in the Department of Corrections, followed by 3 years of mandatory supervised release (MSR). The defendant filed his timely notice of appeal on June 24, 2021.

¶ 46    The defendant filed a *pro se* motion to reconsider sentence on July 9, 2021. The defendant was appointed counsel, and his amended motion to reconsider was filed on December 10, 2021. On January 27, 2022, the amended motion to reconsider the sentence was heard and denied.

¶ 47                                    II. ANALYSIS

¶ 48                          A. Sufficiency of the Evidence

¶ 49    On appeal, the defendant first contends that the evidence adduced at his jury trial was not sufficient to sustain his conviction of being an armed habitual criminal. To sustain a conviction for the offense of being an armed habitual criminal, the State must prove that the defendant knowingly possessed a firearm after having been convicted two or more times of a qualifying offense. 720 ILCS 5/24-1.7 (West 2020). On appeal, the defendant only contests the element of whether he knowingly possessed a firearm.

¶ 50    When a defendant makes a claim that there was insufficient evidence to sustain his conviction, this court reviews the evidence presented at trial in the light most favorable to the prosecution to determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime or crimes of which the defendant was convicted. See, *e.g.*, *People v. Saxon*, 374 Ill. App. 3d 409, 416 (2007). We will not reverse a criminal conviction unless the evidence presented at trial is so improbable or unsatisfactory as to justify a reasonable doubt as to the guilt of the defendant. *Id.* We allow all reasonable inferences from the record in favor of the prosecution, whether the evidence in the case is direct or circumstantial. *Id.*

¶ 51    There is no requirement that this court disregard inferences that flow from the evidence or that this court search out all possible explanations consistent with innocence and raise them to a

level of reasonable doubt. *Id.* at 416-17. We do not retry the defendant, instead leaving it to the trier of fact to judge the credibility of witnesses, resolve conflicts in the evidence, and draw reasonable inferences based upon all of the evidence properly before the trier of fact. *Id.* at 416.

¶ 52    In this case, the defendant posits that the State failed to prove beyond a reasonable doubt that he "knowingly" possessed the firearm recovered from the vehicle he was driving. He contends, *inter alia*, that the gun was concealed beneath the driver's seat of a car that he did not own. Further, he argues that none of the police officers testified that the defendant ever had the gun on his person or saw him place the gun under the seat or make any furtive movements. Defendant alleges that he never gave any statement indicating that he knew the gun was under the seat. Additionally, the defendant contends that while the DNA evidence found on the gun could not exclude him as a possible contributor, he asserts there was no evidence presented of when the DNA was transferred to the gun. As such, the defendant argues that under these circumstances, no rational trier of fact could conclude that the State proved that the defendant knowingly possessed the gun.

¶ 53    In its brief on appeal with regard to this issue, the State counters that the defendant was stopped as part of a separate investigation into both the defendant and the car. The defendant failed to keep his hands out of the window and in view of the police officer and refused to exit the vehicle after being instructed to do so. After defendant exited the vehicle, a black handgun was found under the driver's seat with the handle of the gun, or grip, facing toward the steering wheel. Additionally, the location under the driver's seat where the gun was located was inaccessible from both the front seat passenger seat and rear passenger compartment. The gun was swabbed for DNA, and the results from the grip of the gun revealed the defendant was a major contributor of DNA at 8 of 23 locations. The defendant's DNA profile found at eight locations would only be seen in 1 in 450 billion individuals. The State notes that possession of a firearm may be actual or

constructive and that in this case there was sufficient evidence to establish both actual possession and constructive possession.

¶ 54   In his reply brief, the defendant argues that the State did not prove constructive possession because there was no evidence of control or knowledge. Additionally, he contends that actual possession was also not established.

¶ 55   As explained above, when reviewing a claim such as that made by the defendant in this appeal, this court allows all reasonable inferences from the record in favor of the prosecution, whether the evidence in the case is direct or circumstantial, and will not disregard such reasonable inferences that flow from the evidence. See, *e.g.*, *id.* at 416-17. Moreover, we (1) do not retry the defendant, instead leaving it to the trier of fact to judge the credibility of witnesses, resolve conflicts in the evidence, and draw reasonable inferences based upon all of the evidence properly before the trier of fact, and (2) will not search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt (see *id.*), both of which are exactly what the defendant asks us to do in this appeal.

¶ 56   Knowledge is a question of fact for the trier of fact to decide. *People v. Monteleone*, 2018 IL App (2d) 170150, ¶ 26. "Direct proof of a defendant's knowledge is unnecessary, and a defendant's knowledge can be inferred from the surrounding facts and circumstances." *Id.* "Knowledge may be, and ordinarily is, proven circumstantially." *People v. Ortiz*, 196 Ill. 2d 236, 260 (2001).

¶ 57   "Circumstantial evidence is proof of facts or circumstances that give rise to reasonable inferences of other facts that tend to establish guilt or innocence of the defendant." *Saxon*, 374 Ill. App. 3d at 417. It is axiomatic that "[a] defendant can be convicted solely on circumstantial evidence" and that "[t]he trier of fact does not have to be satisfied beyond a reasonable doubt as to each link in the chain of circumstantial evidence." *Id.*

¶ 58 Possession of a firearm may be actual or constructive. *People v. Ingram*, 389 Ill. App. 3d 897, 899 (2009).

> "Actual possession is the exercise by the defendant of present personal dominion over the illicit material [citation] and exists when an individual exercises immediate and exclusive dominion or control over the illicit material [citation]. Actual possession does not require present personal touching of the illicit material but, rather, present personal dominion over it. [Citation.] *** Where possession has been shown, an inference of guilty knowledge can be drawn from the surrounding facts and circumstances. [Citation.] The fact of possession must be shown beyond a reasonable doubt. [Citation.]" *People v. Schmalz*, 194 Ill. 2d 75, 82 (2000).

"Constructive possession exists where there is no actual, personal, present dominion over contraband, but defendant had knowledge of the presence of the contraband, and had control over the area where the contraband was found." *People v. Hunter*, 2013 IL 114100, ¶ 19.

¶ 59 The evidence that was presented to the jury is described in detail above and speaks for itself. When viewed in the light most favorable to the prosecution, that evidence was sufficient, beyond a reasonable doubt, to sustain the conviction on appeal. The gun was found under the driver's seat of a vehicle the defendant had been driving for hours while drinking. The gun's location made it only accessible to the driver. DNA evidence from the grip of the gun revealed that the defendant was a major contributor to the DNA mixture at eight locations, and the defendant's DNA profile would only be seen in 1 in 450 billion individuals. Viewing this evidence in the light most favorable to the prosecution, the evidence showed that the defendant exercised immediate and exclusive dominion and control over the gun. Additionally, the defendant's actions in refusing to exit the vehicle when instructed to do so and failing to keep his hands out of the window show

17

consciousness of guilt. For all of these reasons, we find there was sufficient evidence to prove beyond a reasonable doubt that the defendant knowingly possessed the handgun.

¶ 60                                    B. Jury Instructions

¶ 61    The defendant's second contention on appeal is that the trial court erred in providing Illinois Pattern Jury Instructions, Criminal, No. 3.01 (approved Oct. 17, 2014) (hereinafter IPI Criminal No. 3.01) to answer a question from the jury. The defendant argues that the language of IPI Criminal No. 3.01 is contrary to the language of the armed habitual criminal statute. The defendant concedes that this issue was not raised in the posttrial motion and asks this court to consider the purported error under the plain error rule. Additionally, the defendant alleges defense counsel was ineffective for failing to preserve this issue for appeal.

¶ 62    In response, the State argues that IPI Criminal No. 3.01 was a correct statement of the law that answered the jury's question. Additionally, the State claims the instructions, when taken as a whole, fairly and fully informed the jury of the relevant law.

¶ 63    In this case, there is no allegation that the jury instructions given prior to the jury beginning its deliberations were in error. The alleged error stems from the trial court's answer to a jury question. The jury asked, "Are we deciding did he have possession of the gun at the time of arrest or any time before this arrest?"

¶ 64    "[T]he general rule is that the trial court has a duty to provide instruction to the jury where it has posed an explicit question or requested clarification on a point of law arising from facts about which there is doubt or confusion." *People v. Childs*, 159 Ill. 2d 217, 228-29 (1994). In response to the question, the trial court provided IPI Criminal No. 3.01 to the jury: "The information states that the offense charged was committed on October 7, 2020. If you find the offense charged was committed, the State is not required to prove that it was committed on the particular date charged."

18

¶ 65    The jury was previously instructed that "[a] person commits the offense of being an armed habitual criminal when he knowingly possesses any firearm after having been convicted of a combination of two or more felonies set forth in 720 ILCS 5/24-1.7." Additionally, the issues instruction stated:

"To sustain the charge of being an armed habitual criminal, the State must prove the following propositions:

First Proposition: That the defendant possessed any firearm; and

Second Proposition: That the defendant had previously been convicted of a combination of two or more of the felonies as set forth in 720 ILCS 5/24-1.7.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

¶ 66    The defendant argues that his case is analogous to the recent Illinois Supreme Court case of *People v. Hartfield*, 2022 IL 126729. In *Hartfield*, a mid-deliberation instruction to the jury conflicted with the previous instructions that had been given. The jury was originally instructed: " 'A person commits the offense of aggravated discharge of a firearm when he knowing[ly] discharges a firearm in the direction of a person he knows to be a peace officer, while the officer is engaged in the execution of his official duties.' " *Id.* ¶ 18. The following question was sent out during deliberations, " 'Does suspect need to know there were 4 cops on the scene in the area where gun was fired [followed here by what appears to be a question mark, perhaps scribbled out]

19

to be guilty of all four counts of [aggravated] discharge of firearm?' " *Id.* ¶ 20. The response that was sent to the jury stated:

> " 'Question #1
>
> No
>
> Question # 2
>
> You must determine based on the evidence which officer or officers, if any, may have been in the line of fire when the firearm was discharged.' " *Id.* ¶ 22.

On review, it was determined that the answer was legally incorrect.

¶ 67 Additionally, in *Hartfield*, the defendant failed to preserve the issue for review, so it was reviewed for plain error. Our supreme court concluded that the mid-deliberation instruction was not an accurate statement of the law and held that the error was presumed prejudicial. "[T]wo directly conflicting instructions on an essential element, one stating the law correctly and the other erroneously, cannot be cured this way due to the simple fact that we can never know which instruction the jury was following." *Id.* ¶ 59.

¶ 68 Our supreme court also considered a similar issue in an even more recent case in *People v. Woods*, 2023 IL 127794. We find the defendant's case is more analogous to that of *Woods*. The *Woods* court explained: "In line with *Hartfield*, we conclude that directly conflicting instructions may be harmless when they do not concern a disputed essential issue in the case so that there is not a fear that the jury relied on the incorrect instruction." *Id.* ¶ 54.

¶ 69 In the present action, the alleged conflicting instructions dealt with the timing of the alleged offense and whether it was after the requisite prior felony convictions. The defendant stipulated to the following in this case: "That on October 7, 2020, the defendant, Demerio Hilson, was a convicted felon, having been previously convicted of a combination of two or more of the enumerated felonies set forth in 720 ILCS 5/24-1.7." The trial court took judicial notice of the files

in the prior cases. The defendant's predicate felony convictions occurred in 2007 and 2008. As a result of this stipulation, there is no dispute about whether the defendant had been previously convicted of a combination of two or more felonies as set forth in section 24-1.7 of the Criminal Code of 2012 (720 ILCS 5/24-1.7 (West 2020)). Accordingly, the alleged erroneous conflicting jury instruction would not be presumed prejudicial and may be harmless. *Woods*, 2023 IL 127794, ¶ 55.

¶ 70  The question of whether the jury instructions accurately conveyed the applicable law to the jury is reviewed *de novo*. *People v. Pierce*, 226 Ill. 2d 470, 475 (2007). Jury instructions are used to give the jurors the applicable law so they can apply it to the facts and reach a correct conclusion. *People v. Hopp*, 209 Ill. 2d 1, 7 (2004). "Jury instructions should not be misleading or confusing [citation], but their correctness depends upon not whether defense counsel can imagine a problematic meaning, but whether ordinary persons acting as jurors would fail to understand them." *People v. Herron*, 215 Ill. 2d 167, 187-88 (2005). "The task of a reviewing court is to determine whether the instructions, considered together, fully and fairly announce the law applicable to the theories of the State and the defense." *People v. Mohr*, 228 Ill. 2d 53, 65 (2008). "Jury instructions should be construed as a whole, rather than read in isolation." *People v. Parker*, 223 Ill. 2d 494, 501 (2006).

¶ 71  In this case, prior to deliberations, the jury was instructed that "[a] person commits the offense of being an armed habitual criminal when he knowingly possesses any firearm *after having been convicted of a combination of two or more felonies set forth in 720 ILCS 5/24-1.7*." (Emphasis added.) Additionally, the jury was instructed:

"To sustain the charge of being an armed habitual criminal, the State must prove the following propositions:

First Proposition: That the defendant possessed any firearm; and

21

Second Proposition: *That the defendant had previously been convicted of a combination of two or more of the felonies as set forth in 720 ILCS 5/24-1.7.*

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty." (Emphasis added.)

The instruction provided in response to the jury's question stated: "The information states that the offense charged was committed on October 7, 2020. *If you find the offense charged was committed*, the State is not required to prove that it was committed on the particular date charged." (Emphasis added.)

¶ 72    When these instructions are reviewed as a whole, we find that no error occurred. The response to the jury's question still required the jury to find that the offense charged was committed. For the offense charged to have been committed, it was a prerequisite that the defendant have the two prior felony convictions—a matter that was stipulated to in this trial.

¶ 73    Assuming *arguendo*, that the response to the jury's question was in error and in conflict with the earlier instructions, said error would be harmless. "Instructional errors are reviewed under a harmless error, not a reasonable doubt, analysis." *People v. Dennis*, 181 Ill. 2d 87, 95 (1998). "An error in a jury instruction is harmless if it is demonstrated that the result of the trial would not have been different had the jury been properly instructed." *People v. Pomykala*, 203 Ill. 2d 198, 210 (2003). "Where the evidence of guilt is clear and convincing, an instructional error may be deemed harmless." *Dennis*, 181 Ill. 2d at 95.

¶ 74    In this case, had the jury been instructed by the response to their question, that while the State was not required to prove that defendant committed the charged offense on October 7, 2020, so long as the offense charged was committed after defendant's second felony conviction in 2008, would the outcome of the trial have been different? We find that the outcome would have been the same, and as such, the error was harmless. The stipulation agreed to by the defendant established that the defendant was a convicted felon, having been previously convicted of a combination of two or more of the enumerated felonies set forth in section 24-1.7 of the Criminal Code of 2012 (720 ILCS 5/24-1.7 (West 2020)). The defendant did not expressly state that he was being tried for an alleged possession of a firearm prior to 2008, 12 years before the charged offense; however, that is what his present argument implies, and such is absurd.

¶ 75    As an alternative theory, the defendant contends that if the alleged jury instruction error was not plain error, we should find that the defendant's trial counsel was ineffective for failing to preserve the issue for review. We review a claim of ineffective assistance of counsel *de novo*. *People v. Hale*, 2013 IL 113140, ¶ 15.

¶ 76    Allegations of ineffective assistance of counsel are reviewed pursuant to the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Cathey*, 2012 IL 111746, ¶ 23. To prevail on a claim of ineffective assistance of counsel, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Moreover, to succeed on such a claim, a defendant must demonstrate both that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance resulted in prejudice. *Id.* at 687-88.

¶ 77    "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). The defendant's failure to satisfy either the deficiency prong or the prejudice

prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *Strickland*, 466 U.S. at 697. "In order to satisfy the deficient-performance prong of *Strickland*, a defendant must show that his counsel's performance was so inadequate that counsel was not functioning as the 'counsel' guaranteed by the sixth amendment. Counsel's performance is measured by an objective standard of competence under prevailing professional norms." (Internal quotation marks omitted.) *People v. Manning*, 241 Ill. 2d 319, 326-27 (2011).

¶ 78 As set forth above, we find that there was no error in the jury instructions that the defendant is now claiming resulted in ineffective assistance of counsel. Accordingly, the defendant is unable to establish that his counsel was objectively deficient.

¶ 79 Further, the defendant would be unable to establish the prejudice prong. With respect to the prejudice prong, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. Errors by counsel "come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial." *Id.* at 693. "In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Harrington v. Richter*, 562 U.S. 86, 111 (2011). Rather, "*Strickland* asks whether it is 'reasonably likely' the result would have been different." *Id.* Like the matter before us, when "a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695.

¶ 80 As discussed above, if the alleged errors had not occurred, the result would have been the same. The timing of defendant's prior felony convictions was not at issue.

24

¶ 81                           C. Amended MSR Statute

¶ 82    The defendant's final contention on appeal is that his MSR should be reduced from 3 years to 18 months due to an amendment to the statute that reduced the MSR term for some Class X felonies, including the one for which the defendant was convicted, from 3 years to 18 months. Pub. Act 101-652 (eff. July 1, 2021) (amending 730 ILCS 5/5-8-1(d)(1.5)). The defendant argues that his sentence was not final because of a pending motion to reconsider sentence.

¶ 83    The State argues that the defendant received a final sentence on June 17, 2021. The State contends that because the defendant was sentenced prior to the effective date of the amendment, it does not apply to his MSR.

¶ 84    Whether a statute applies to a defendant is a legal question reviewed *de novo*. *People v. Cardamone*, 232 Ill. 2d 504, 511 (2009). The relevant portions of the amended statute provide as follows:

"(d) Subject to earlier termination under Section 3-3-8, the parole or mandatory supervised release term shall be written as part of the sentencing order and shall be as follows:

***

(1.5) except as provided in paragraph (7) of this subsection (d), for a Class X felony ***, if committed on or after January 1, 2009, 18 months;

* * *

(g) Notwithstanding any other provisions of this Act and of Public Act 101-652: *** (ii) the provisions of paragraphs (1.5) and (2) of subsection (d) are effective on July 1, 2021 and shall apply to all individuals convicted on or after the effective date of paragraphs (1.5) and (2) of subsection (d)." 730 ILCS 5/5-8-1(d), (g) (West Supp. 2021).

¶ 85    TheIllinois Supreme Court has adopted the United States Supreme Court's retroactivity analysis set forth in *Landgraf v. USI Film Products*, 511 U.S. 244 (1994). *Commonwealth Edison Co. v. Will County Collector*, 196 Ill. 2d 27, 38-39 (2001). "Under the *Landgraf* test, if the legislature has clearly indicated what the temporal reach of an amended statute should be, then, absent a constitutional prohibition, that expression of legislative intent must be given effect." *Id.* at 38. The Illinois Supreme Court later clarified:

"[B]ecause of the existence of section 4 of the Statute on Statutes [citation], application of the *Landgraf* test in Illinois would 'prove uneventful.' [Citation.] Section 4 is a general savings clause, which [the Illinois Supreme Court] has interpreted as meaning that procedural changes to statutes will be applied retroactively, while substantive changes are prospective only." *People ex rel. Alvarez v. Howard*, 2016 IL 120729, ¶ 20.

¶ 86    Section 4 of the Statute on Statutes states as follows:

"No new law shall be construed to repeal a former law, whether such former law is expressly repealed or not, as to any offense committed against the former law, or as to any act done, any penalty, forfeiture or punishment incurred, or any right accrued, or claim arising under the former law, or in any way whatever to affect any such offense or act so committed or done, or any penalty, forfeiture or punishment so incurred, or any right accrued, or claim arising before the new law takes effect, save only that the proceedings thereafter shall conform, so far as practicable, to the laws in force at the time of such proceeding. *If any penalty, forfeiture or punishment be mitigated by any provisions of a new law, such provision may, by the consent of the party affected, be applied to any judgment pronounced after the new law takes effect*. This section shall extend to all repeals, either by express words or by implication, whether the repeal is in the act making any new

26

provision upon the same subject or in any other act." (Emphasis added.) 5 ILCS 70/4 (West 2020).

¶ 87 The portion of section 4 emphasized above is a specific provision regarding the applicability of new laws that mitigate a penalty or punishment. The Illinois Supreme Court in *People v. Hunter*, 2017 IL 121306, ¶¶ 52-54, found that whether statutory changes were "properly labeled 'procedural' or 'substantive,' " the above language from section 4 meant that if the changes mitigated a punishment, they could not be applied to defendants who were sentenced prior to the effective date of the statute. This is based on longstanding precedent. In *People v. Hansen*, 28 Ill. 2d 322 (1963), "the defendant was not entitled to be resentenced under the new criminal code, which went into effect just 13 days after he was sentenced, because, under section 4, 'a punishment mitigated by a new law is applicable only to judgments after the new law takes effect.' " *Hunter*, 2017 IL 121306, ¶ 54 (quoting *Hansen*, 28 Ill. 2d at 340-41). In *People v. Lisle*, 390 Ill. 327, 328 (1945), the court found that section 4 "does not give the defendant the right to be sentenced under a law not in full force and effect at the time of his sentence."

¶ 88 In this case, the jury found the defendant guilty of being an armed habitual criminal on April 20, 2021. On June 17, 2021, 13 days prior to the amended statute taking effect, the defendant was sentenced to serve 24 years in the Department of Corrections, followed by 3 years of MSR. Defendant filed a *pro se* motion to reconsider sentence on July 9, 2021. Defendant was appointed counsel, and his amended motion to reconsider was filed on December 10, 2021. On January 27, 2022, the amended motion to reconsider the sentence was heard and denied.

¶ 89 Like the court in *People v. Brown*, 2023 IL App (4th) 220400, ¶ 44, we find that supreme court case authority refutes the defendant's argument that there was no final judgment until his posttrial motion was ruled on. The supreme court has "consistently held that ' "[t]he final judgment in a criminal case is the sentence." ' " *People v. Walls*, 2022 IL 127965, ¶ 23 (quoting *People v.*

*Abdullah*, 2019 IL 123492, ¶ 19, quoting *People v. Caballero*, 102 Ill. 2d 23, 51 (1984)). As such, the date of the defendant's final judgment in this case was the date he was sentenced, June 17, 2021. Accordingly, he was not entitled to have the new version of the statute applied to his case.

¶ 90                                      III. CONCLUSION

¶ 91    For the foregoing reasons, we affirm the defendant's conviction and sentence.


¶ 92    Affirmed.

*People v. Hilson*, 2023 IL App (5th) 220047

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Champaign County, No. 20-CF-1145; the Hon. Roger B. Webber, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Emily E. Filpi, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Julia Rietz, State's Attorney, of Urbana (Patrick Delfino, Edward R. Psenicka, and Pamela S. Wells, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |