NOTICE

Decision filed 07/16/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230650-U

NO. 5-23-0650

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 21-CF-911 |
| | ) | |
| ANTHONY M. MILES, | ) | Honorable |
| | ) | Roger B. Webber, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE SHOLAR delivered the judgment of the court.
Justices Moore* and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*: The evidence was sufficient to support the defendant's convictions where the combined strength of the circumstantial evidence was adequate to allow reasonable jurors to find all the essential elements of the offenses beyond a reasonable doubt and to conclude that the defendant was the individual who committed the offenses. Challenged remarks during the State's closing argument would not have warranted reversal had the defendant objected to them where some of the remarks were proper, and the improper remarks were not prejudicial enough to require reversal. Further, the defendant did not receive ineffective assistance of counsel.

¶ 2    The defendant, Anthony M. Miles, was convicted of possession of a controlled substance with intent to deliver, armed violence, and being an armed habitual criminal. All three offenses stemmed from the discovery of five weapons hidden in a backyard along with a substance

_____

*Justice Welch participated in oral argument. Justice Moore was later substituted on the panel and has read the briefs and listened to the recording of oral argument.

1

containing cocaine and a digital scale. The evidence connecting the defendant to these items was largely circumstantial. The defendant appeals his convictions, arguing that (1) the evidence was insufficient to prove his guilt beyond a reasonable doubt, (2) the prosecution made several improper and inflammatory remarks during closing argument, and (3) he received ineffective assistance of counsel. We affirm.

¶ 3                                I. BACKGROUND

¶ 4      At approximately 11:30 on the morning of November 10, 2020, two individuals fired shots at a house at 3002 Ridgewood Court in Champaign, Illinois. After the shooters fled on foot, a witness observed two men exit the house. The men went behind a house across the street for several minutes. Evidence introduced at trial showed that the two men emerged from the backyard separately, then left in a vehicle driven by a third individual. When police searched the backyard of 3003 Ridgewood Court, they uncovered five guns, a digital scale, and a measuring cup filled with a white powdery substance containing cocaine. These items were hidden together under a tarp and a rug. Swabs taken from the handles of the guns were submitted to the Illinois State Police crime laboratory for comparison to a state-wide database of known DNA standards. This comparison revealed that one of the swabs matched the defendant's DNA.[1]

¶ 5      The defendant was subsequently arrested and charged with one count each of armed violence (720 ILCS 5/33A-2(a) (West 2018)), possession of a controlled substance with intent to deliver (720 ILCS 570/401(a)(2)(A) (West 2018)), and being an armed habitual criminal (720

---

[1]The State subsequently filed a motion to take a buccal swab from the defendant's cheek for purposes of further DNA analysis. The DNA analyst who testified at trial compared the DNA extracted from the swab of the gun's handle to the DNA extracted from the buccal swab. She explained that the statistical likelihood of any individual matching the partial profile found on the gun was 1 in 53 quintillion and that the defendant could not be excluded. She did not specifically testify as to whether the partial profile—which contained information found at 13 of 23 loci—was considered "a match." Although the State presented testimony concerning the initial comparison to the state-wide database at a probable cause hearing, it did not present this evidence at trial.

ILCS 5/24-1.7(a) (West 2018)).[2] The matter proceeded to a trial in February 2023. A key issue was whether the evidence was sufficient to establish that the defendant was one of the two men observed at the scene.

¶ 6    Tera Conner, who witnessed the events at issue, testified for the State. At the time of the incident, Conner worked at Carpenters Local 243, located at the corner of South Duncan Street and Ridgewood Court. Conner testified that her office window faced Ridgewood. At 11:30 on the morning of November 10, 2020, Conner heard gunshots. She looked out her office window and saw two "younger guys" shooting at a house and a nearby vehicle. When shown a map of the neighborhood, she identified the house involved as 3002 Ridgewood Court. She indicated that the two shooters fled the scene on foot, shooting as they ran.

¶ 7    Conner called 911 to report the shooting. She testified that while she was on the phone, she saw two men exit 3002 Ridgewood Court, cross the street, and go behind a home across the street. Pointing to the map, she indicated that the two men went between 3003 and 3005 Ridgewood. Conner could not identify either man. However, she described one man as wearing all gray clothing and the other as wearing all black clothing. She testified that the man wearing gray clothing ran across the street, and she could see the barrel of a gun sticking out from under his jacket. The man dressed in black clothing walked more slowly and appeared to be holding his waist. Conner testified that the men emerged approximately four minutes later, and the man in gray was no longer carrying a gun.[3]

---

[2]Initially, the defendant was also charged with possession of a stolen firearm (720 ILCS 5/24-3.8(a) (West 2018)). However, the State did not pursue this charge at trial.
[3]We note that other evidence showed that the man in gray clothing emerged alone a little over three minutes after the two men went between the houses at 3003 and 3005 Ridgewood Court and that the man in black clothing emerged roughly four minutes later. Conner was not asked to clarify her testimony concerning the timing.

¶ 8    Conner explained that Carpenters Local had a security camera focused on its parking lot. She noted that 3003 and 3005 Ridgewood and their front yards were visible in the upper right-hand corner of the video feed, but 3002 Ridgewood was not visible within the frame. A portion of the video recorded at the relevant time was entered into evidence along with a zoomed-in video showing the relevant area in the upper right corner of the video captured by the security camera. Both were played for the jury.

¶ 9    We note that it is difficult to see details on either video. In the original video captured by the security camera, the figures are too small to see much detail, and the figures are somewhat distorted by pixelation in the zoomed-in video. Nevertheless, a man in gray clothing can be seen walking across the street and going between two houses, and a man dressed in black can be seen running across the street seconds later and going between the same two houses. The time stamp on the original video indicated that this occurred at 11:30:55 a.m. At 11:34:10, the man in gray can be seen emerging from between the two houses alone and walking back across the street in the direction of 3002 Ridgewood. The video ends a few seconds later.

¶ 10    Officer Danielle Griffet of the Champaign Police Department was the first officer to arrive on the scene in response to Conner's 911 call. She testified that when she arrived, she saw a man dressed in gray and a woman standing in the driveway. She later clarified that she saw the man exit the house. The woman, Mya Taylor, lived at 3002 Ridgewood Court. Griffet described her as uncooperative. According to Griffet, Taylor identified the man in gray clothing as her brother and indicated that she had called him for help because of the shots fired at her home. Taylor told Griffet that she was alone at the time of the shooting. Griffet later learned from other officers that the man identified himself as Javon Tate. Griffet testified that after she briefly spoke with Tate, he walked away and did not return to the scene.

4

¶ 11 Griffet explained that initially, the investigation was focused on 3002 Ridgewood Court, where the shooting occurred. During the course of the investigation, however, officers learned that a witness saw individuals crossing the street shortly after the shots were fired. This information led to a search of the backyard of 3003 Ridgewood Court, where officers found firearms and drugs.

¶ 12 Griffet identified video recordings taken from her body-worn camera, the dash cam of her patrol car, and the dash cam of Officer Ganesh Reddy's patrol car. These videos were entered into evidence and played for the jury.

¶ 13 The footage from Griffet's dash cam showed the vehicle approach 3002 Ridgewood Court, and a woman standing in the driveway alone. Griffet's vehicle parked in front of the house at 11:35:14, with the house involved in the shooting—3002 Ridgewood—on the right side of the street. At 11:35:36, a man dressed in gray clothing entered the frame from the right. He walked down the driveway toward the curb, holding a cell phone. The man in gray then walked away from the scene towards a location where Ridgewood Court curved to the left. The man disappeared around the corner at 11:37:18.

¶ 14 At 11:38:12 on Griffet's dash cam video, a man dressed in black entered the left side of the frame from across the street, talking on a cell phone. He stopped and stood in the driveway of 3002 Ridgewood Court near the curb. A dark blue vehicle pulled up to the curb, the man entered it at 11:38:48, and the vehicle drove away.

¶ 15 On the video recording from Reddy's dash cam, a vehicle, which appeared to be the same vehicle seen in Griffet's dash cam footage, pulled over to the right side of the street near the corner where Ridgewood Court turned to the left. The man in gray clothing crossed toward the vehicle and entered the vehicle at 11:39.

¶ 16    Sergeant Matthew Crane arrived at the scene shortly after Griffet. He confirmed Griffet's testimony that a man in gray clothing walked away from the scene down Ridgewood Court, and he noted that the man's clothing was consistent with that of the man seen on Reddy's dash cam footage. He further testified that the man was picked up by a dark-colored Toyota vehicle.

¶ 17    Crane testified that he and Griffet searched the back yard of 3003 Ridgewood Court with the resident's permission. There, they discovered a tarp which, unlike the rest of the yard, was not covered by leaves. Under the tarp, they found a carpet held in place by a weight. Lifting the carpet revealed "several guns and *** a white plastic bag." Inside the bag were a digital scale and a measuring cup containing a white powdery substance they suspected was cocaine. Crane specified that the weapons uncovered during their search included four handguns and one rifle.

¶ 18    The parties stipulated that an Illinois State Police forensic scientist tested the white powder and determined that it was 28.8 grams of a substance containing cocaine. This stipulation was read into the record.

¶ 19    Detective Lance Carpenter was qualified to testify as an expert witness based on his experience and training involving narcotics investigations. He opined that the cocaine found in the backyard behind 3003 Ridgeway Court was intended for sale. He explained that the amount of cocaine present was too large to be for personal use. In addition, he stated that the only purpose served by the digital scale found with the cocaine would be to measure portions of cocaine for sale. Carpenter noted that the weapons found with the drugs were also consistent with a narcotics-selling operation.

¶ 20    Finally, Carpenter testified about the vehicle seen leaving the scene. He explained that it was likely a rental car because it had out-of-state plates from Michigan, and the owner could not be located. Carpenter also stated that the vehicle appeared to be a Toyota RAV-4. Based on his

6

familiarity with that type of vehicle and his review of the video recordings entered into evidence in this case, Carpenter estimated that the height of the vehicle was between five feet five and one-half inches and five feet seven inches high. He further testified that when the defendant was booked after his arrest, his height was noted to be five-foot-seven.

¶ 21 Forensic scientist Jennifer Acosta-Talbot performed the DNA analysis. She testified that she obtained complete DNA profiles for both Tate and the defendant from buccal swabs taken from each of them. She explained that a complete DNA profile consisted of information from 23 loci. She testified that even with a partial DNA profile, it was possible to perform a statistical analysis.

¶ 22 Acosta-Talbot testified about the results of the analysis she performed comparing the DNA samples obtained through swabs from the handles of two of the weapons with the samples obtained through the buccal swabs from the defendant and Tate. The swab taken from the handle of the Ruger handgun yielded a mixed DNA profile from at least three individuals. However, Acosta-Talbot was able to extract a partial profile with information at 13 loci that she identified as being the major profile. She testified that this major profile came from a male and that, while Tate was excluded as a possible contributor, the defendant was included. She further testified that the frequency of people whose DNA matched the partial profile was 1 in 53 quintillion.

¶ 23 Acosta-Talbot testified that analysis of the swab taken from the handle of the rifle likewise indicated a mixed DNA profile with at least three individuals. She was able to obtain a complete profile for the major profile. She testified that the defendant was excluded as a possible contributor. Tate, however, was included, and the frequency of individuals with matching DNA profiles was 1 in 17 octillion.

¶ 24 When asked how DNA could get on the handles of the weapons, Acosta-Talbot explained that it could be found in skin cells deposited there. She testified that usually, DNA would not be found on an object a person had only handled once.

¶ 25 On cross-examination, Acosta-Talbot explained that although she could determine that the DNA profiles on each gun handle contained the DNA of at least three individuals, it was possible that they contained DNA from more than three individuals. She further testified that it was possible to leave DNA on an object without touching it. She noted, for example, that this could happen through saliva from a cough or sneeze. She also testified that skin cells could be transferred from person to person through a handshake and then transferred indirectly to an object. Finally, Acosta-Talbot acknowledged that there was no way to know how the DNA profiles transferred on the handles of the weapons.

¶ 26 Officer Caleb Rice testified concerning an earlier incident at the same location. In August 2020, three months before the events at issue in this case, Rice responded to a report of a burned-out vehicle parked in front of 3002 Ridgewood Court. Rice had the vehicle towed and learned that the defendant was the vehicle's owner. He identified the vehicle registration listing the defendant as the owner; the registration was entered into evidence. On cross-examination, Rice explained that he had been called to the scene because the burned-out vehicle "was potentially involved in a shooting." He acknowledged that he did not interview the defendant at that time, and he did not know if the defendant's vehicle was involved in an incident that occurred on the day he towed it. He further acknowledged that he knew nothing about the defendant's vehicle at any other time.

¶ 27 The State offered into evidence a mugshot photograph of the defendant, arguing that it was relevant to allow jurors to compare the photograph with the man in black clothing who appeared in the video recordings. The court admitted the photo over the defendant's objection.

¶ 28 The parties stipulated that the defendant was previously convicted of two previous felonies for purposes of the armed habitual criminal charge. This stipulation was read into evidence.

¶ 29 At the close of the State's case, the defendant moved orally for a directed verdict. He argued that there was no evidence tying him to the drugs. Although he acknowledged the evidence that his DNA was found on one of the weapons, he emphasized that the State must prove possession of the drugs *while* armed. In response, the State argued that the evidence was sufficient to prove the man in black clothing seen on the video recordings was the defendant because that individual matched the defendant's build, the defendant's DNA was found on the handle of the Ruger, and the defendant was associated with a previous incident at the same location three months earlier. The State then emphasized that for a period of approximately five minutes, the only person behind 3003 Ridgewood Court was the person in black clothing, which gave him exclusive control over the guns and drugs during this period. The court denied the motion.

¶ 30 The defendant called only one witness in defense—Amii Webb, his former girlfriend and the mother of four of his children. Webb testified that during a two-month period that included November 2020, the defendant cared for their children in her home while she was at work. She stated that she worked weekdays from 8 a.m. to 4 p.m. On cross-examination, Webb acknowledged that she was not certain exactly what two-month period the defendant watched their children, but she stated that she "believe[d] it was November." She noted that it was a long time ago.

¶ 31 The State asked Webb whether the defendant contributed anything financially, and she stated that she paid all the bills. Asked how the defendant supported himself, Webb indicated she did not know. The prosecutor asked, "Was he selling drugs?" Webb replied, "No, not that I know of." The following exchange then took place:

"Q. So it's possible?

9

MR. MARTINKUS [defense counsel]: Objection as to possible.

THE COURT: Overruled.

Q. You don't know what he was doing to sustain himself. It could have been selling drugs?

A. I have no idea. Are—we co-parent, and that's my only concern."

¶ 32 The State again asked Webb if she was certain the defendant was caring for their children during November of 2020. He then confronted her with a letter she had written in August 2022, in which she had stated that the defendant watched her children in November 2021. Webb testified, "Whatever it says on the letter is more accurate than what I'm saying now." On redirect examination, defense counsel asked Webb, "So, ma'am, just for my clarity, too, even if you put November 2021[,] you're talking about November when this whole thing took place; is that correct?" Webb replied, "Correct."

¶ 33 On recross, the State asked Webb to clarify what she meant by "when this whole thing took place." Initially, she stated that she meant when the shooting took place. Then, the prosecutor asked, "When—are you talking about when he got arrested?" Webb responded, "No." After further questioning, she agreed that the defendant left town for a while, went to Texas, and then returned. She testified that she only learned of the incident at issue in this case after the defendant was arrested, and she could not recall when that happened. The following exchange then took place:

"Q. So we're just trying to establish that you know—you knew when he was watching your kids in November, but you're not sure if it's 2020 or 2021?

A. I'm going to say, yeah, I know he was watching my kids around that time frame.

Q. Okay, ma'am, but what time frame?

A. I can't give you exact—yeah, I'm going to say it was 2021."

10

¶ 34 The matter then proceeded to closing arguments. Before the attorneys presented their arguments, the trial court addressed the jury, stating, "What the attorneys say during their arguments is not evidence and should not be considered by you as evidence." The State began its argument by telling jurors that the evidence presented during the trial pointed "to one conclusion"—specifically, the conclusion that "Anthony Miles is a drug dealer," who had been dealing drugs from 3002 Ridgewood Court with his partner, Tate. He then explained that the issues for the jury to decide were narrow—whether the defendant committed the three crimes he was charged with, whether he was a drug dealer, whether he possessed the gun, and whether he possessed the drugs. The State argued that the jury need not concern themselves with what happened to the two people who shot at the house.

¶ 35 Next, the State summarized the events at issue, telling the jury that after shots were fired at the "drug house" located at 3002 Ridgewood Court, the defendant and Tate knew that the police would soon be there to investigate, which gave them "a matter of minutes to hide their drugs and their guns." He explained that they hid the drugs and weapons across the street, in the backyard of 3003 Ridgewood Court. He emphasized that the defendant and Tate acted together. He argued, "And they didn't just ditch these items. They didn't just throw them away so they wouldn't get caught with them; they hid them. They hid them with the clear intent to go back and get them, to go back and use them." In support of this argument, he reminded the jury that the drugs and weapons were hidden "under not just a tarp, but also under a rug."

¶ 36 The State then reviewed the relevant evidence pertaining to the hiding of the drugs and weapons. First, he noted that two people were seen going behind the house, one of whom had a visible rifle, and that two people subsequently emerged with no visible rifle. Then, he reminded the jury that the DNA of the defendant and Tate were found on the guns.

11

¶ 37    At this point, the State played a video for the jury. It is not clear from the record which of the videos admitted into evidence he played. As the video played, he continued his argument, stating as follows:

> "He's wearing all black just like the person who runs across the street. Same height, same build, same facial features. Eyes, nose, mouth, shape of the head, nose, same beard, same profile, his nose. And there, look at that, same chin. Same chin, same beard. This case really is as simple as believing your own eyes. Who else could that be?"

The prosecutor reiterated that the defendant's DNA was "found where this person walked behind that house." He argued, "That cannot be a coincidence."

¶ 38    The State highlighted additional evidence to support the conclusion that the man seen on the video wearing black clothing was the defendant. In particular, the prosecutor reminded the jury of the evidence that the defendant was five-foot-seven and the testimony that the type of vehicle that picked up the man on the video was also approximately five feet and seven inches high. He then noted that the man in the video appeared to be roughly the same height as the vehicle that picked him up.

¶ 39    The State then emphasized the evidence that the defendant's burned-up vehicle was towed from the same location three months before the events at issue in this case. The prosecutor argued, "So Anthony Miles has a direct tie to this drug house," and further argued, "He wants you to believe that he is a humble babysitter." He argued, however, that babysitters' cars were not "burned up in front of drug houses" and that babysitters' DNA were not found on guns hidden with thousands of dollars of illicit drugs. He stated, "That's what drug dealers do."

¶ 40    The State reviewed the elements of the crimes charged. The prosecutor explained that to sustain the charge of possession of cocaine with intent to deliver, the State had to prove two

elements: (1) the defendant or someone whose conduct he was legally responsible for knowingly possessed the cocaine, and (2) the defendant or other person did so with the intent to sell it. The State reminded the jury that the parties stipulated to the fact that the white powdery substance discovered behind 3003 Ridgewood Court was cocaine. He then discussed evidence that the cocaine was intended for sale. Specifically, he pointed out that the amount of cocaine was larger than would be used for personal consumption and that it was found with a digital scale, indicating an intent to divide into smaller quantities to package and sell.

¶ 41     Addressing the element of possession, the prosecutor told the jury that it did not matter who carried the cocaine across the street because the evidence showed that Tate and the defendant were "working together." He explained, "A person is legally responsible for the conduct of another when *** with the intent to promote or facilitate the offense, they knowingly solicit, aids, abets, agrees to aid in the commission of the offense." The State argued that the defendant and Tate were clearly working together because they "both ran across the street with the guns and drugs." He further argued, however, that because Tate emerged from behind 3003 Ridgewood Court several minutes earlier than the defendant, the defendant exercised "sole exclusive possession" of all the items found there during those minutes. He explained that constructive possession required only the intent and power to exercise control over the items.

¶ 42     Moving on to the elements of armed violence, the prosecutor told the jury that the question before them was whether the defendant committed the offense of possession of cocaine while holding a gun. He emphasized that the defendant's DNA was found on the gun handle. He also noted that both the guns and drugs had to be transported across the street and argued that this indicated that the defendant was, indeed, carrying the gun at the time he possessed the cocaine. Finally, he pointed to the evidence that the defendant was holding the waistband of his pants as he

13

crossed the street to 3003 Ridgewood but was no longer doing so when he returned. The prosecutor argued that this was likely because his pockets were weighed down by the guns when he crossed the street the first time.

¶ 43    Next, the prosecutor told jurors that the two elements of the armed habitual criminal charge were (1) possession of a firearm and (2) prior convictions of two or more felonies. He reminded them that the parties stipulated that the defendant had the requisite prior convictions. The prosecutor then discussed the DNA evidence in greater detail. He emphasized the evidence that the likelihood of any individual contributing to the major DNA profile found on the Ruger handle was 1 in 53 quintillion. The State acknowledged that the swab resulted in a mixed profile consisting of DNA from multiple people. He told jurors, "Multiple people have handled these guns. This is a drug-dealing operation, right? More than one people [*sic*] could have their DNA on it. That would make sense." He argued, however, that the major profile was the defendant's and that this evidence must be viewed in conjunction with the evidence that the defendant's vehicle had been burned in front of the same house three months before the incident and video showing a man with the same height, build, and facial features getting into a vehicle that also picked up Tate, the man whose DNA was found on the other gun. The prosecutor argued that, based upon this evidence, "there is only one conclusion: Anthony Miles is a drug dealer, and he's guilty."

¶ 44    The State urged the jury not to see the defendant as a victim because he was inside a house that was shot at by other individuals. He argued that the defendant "is a drug dealer who brought that violence on himself and knew it was coming." In conclusion, the prosecutor stated, "It's time for him to be held accountable for injecting that into that house in that community. So hold him accountable and please find him guilty."

14

¶ 45    In the defendant's closing argument, defense counsel emphasized the lack of any in-court identification of the defendant as the person seen in the video recordings.[4] He noted that some of the police officers who testified were familiar with the defendant from prior interactions with him, but none of them identified him as the man in the videos. He argued, "It is unfair for the State to ask you to make a determination based upon facial features that are blurry and so forth." Counsel also noted that the State had the power to subpoena Taylor and Tate as witnesses. He argued that the most reasonable inference to be drawn from the prosecution's decision not to do so is that their testimony would not have supported the prosecution's case.

¶ 46    Defense counsel emphasized that the only question before the jury was what happened on the date in question, not what might have happened at 3002 Ridgewood Court on some other occasion. He told jurors, "And you can't let the emotion that the prosecutor brings here just imploring you to find my client guilty. That's not the basis."

¶ 47    Defense counsel further emphasized that the burden of proof was on the State. He argued that the State presented no evidence of the defendant's intent and no evidence connecting him to the drugs. He reminded jurors that although the defendant's DNA was found on one of the guns, the State's DNA expert testified that she could not determine how it got there. He concluded by arguing that the State had not proven its case.

¶ 48    In rebuttal, the State addressed the argument that it failed to call Taylor or Tate as witnesses. He argued that because they were involved, they were not likely to be cooperative witnesses. In addressing the defense's argument concerning the lack of identification by any of the testifying officers, the prosecutor reminded jurors that the investigating officers did not have any

---

[4]We note that defense counsel referred to a person "in that picture." However, reading his statement in context, it is apparent that he was actually referring to the videos, not to a photograph.

reason to consider the defendant a suspect while they were at the scene. He further argued that it was the jurors' job, as finders of fact, to look at the video recordings in evidence "and determine what it looks like." He reiterated his argument that the surveillance video "shows a person, same height, build, facial features as the defendant." The State further argued that Webb's testimony that the defendant was not working at the time showed that he was a drug dealer. He concluded by asking jurors to "send a message."

¶ 49    Once closing arguments were concluded, the trial court provided jury instructions. In pertinent part, the court instructed the jury that its decision should not be influenced by prejudice or sympathy. The court reiterated its earlier instruction, telling the jury that opening statements and closing arguments were not evidence. In addition, the court told the jury, "Any statement or argument made by the attorneys which is not based on the evidence should be disregarded."

¶ 50    Notably, the trial court did *not* instruct the jury that the State was not required to prove that the offenses occurred on the date alleged in the charges, an instruction requested by the prosecution. In declining to provide this instruction, the court accepted the defendant's contention that the instruction could cause confusion because the charge of armed violence required the State to prove that the defendant possessed a weapon while committing the drug offense.

¶ 51    During deliberations, the jury sent out a note which read, "Is the scope of the charge [of] armed habitual criminal limited to possession of a firearm *on* the date November 10, 2020, or *any* date leading up to November 10, 2020? Must the State prove possession on that date?" (Emphases in original.) The prosecutor asked the trial court to respond by instructing the jury that the State did not have to prove that the offenses occurred on the date charged. The court again refused to provide this instruction, telling the jury instead that it had received all the instructions necessary to resolve the issues.

¶ 52    After further deliberation, the jury returned guilty verdicts on all three charges. The trial court subsequently sentenced the defendant to concurrent terms of 22 years on the drug charge, and 18 years on each of the other charges. The defendant filed a motion to reconsider his sentences, which the court denied.

¶ 53    This timely appeal followed.

¶ 54                                    II. ANALYSIS

¶ 55    On appeal, the defendant argues that (1) the evidence presented at trial was insufficient to prove him guilty beyond a reasonable doubt of any of the charged offenses, (2) improper statements by the prosecutor during the State's closing argument deprived him of a fair trial, and (3) he received ineffective assistance of counsel. For the reasons that follow, we disagree and affirm.

¶ 56                          A. Sufficiency of the Evidence

¶ 57    The defendant first argues that the evidence was insufficient to prove that he committed any of the offenses charged. We disagree.

¶ 58    In a challenge to the sufficiency of the evidence, we review the evidence in the light most favorable to the State and determine whether any rational trier of fact could have found the essential elements of the offenses charged beyond a reasonable doubt. *People v. Tamayo*, 2012 IL App (3d) 100361, ¶ 16. It is the role of the finder of fact—in this case, the jury—to determine the credibility of witnesses, weigh their testimony, and draw reasonable inferences from the evidence presented. *Id.* Resolving conflicts in the evidence is also within the purview of the jury. *People v. Hilson*, 2023 IL App (5th) 220047, ¶ 51. It is not the role of a reviewing court to retry a defendant. *People v. Minniweather*, 301 Ill. App. 3d 574, 577 (1998). Instead, our duty is "to carefully examine the evidence, giving due consideration to the fact that the [trial] court and jury saw and

17

heard the witnesses." *People v. Smith*, 185 Ill. 2d 532, 541 (1999). In doing so, we must allow all reasonable inferences from the evidence in favor of the prosecution. *Hilson*, 2023 IL App (5th) 220047, ¶ 50. We are not required to ignore inferences that flow naturally from the evidence or to search out all inferences consistent with a defendant's innocence. *Id.* ¶ 51. We give great deference to the factual findings of the jury; however, its findings are not conclusive. *Tamayo*, 2012 IL App (3d) 100361, ¶ 16. We will reverse only if the evidence is so improbable or unsatisfactory that it gives rise to a reasonable doubt as to defendant's guilt. *Hilson*, 2023 IL App (5th) 220047, ¶ 50.

¶ 59    As the defendant correctly points out, nearly all the evidence in this case was circumstantial. Circumstantial evidence is evidence of facts and circumstances from which jurors can reasonably infer other facts that tend to prove defendant's guilt or innocence. *Id.* ¶ 57. Illinois courts have consistently held that circumstantial evidence alone may be sufficient to support a conviction. *People v. Patterson*, 217 Ill. 2d 407, 435 (2005); *Hilson*, 2023 IL App (5th) 220047, ¶ 57. However, the State must prove each element of the offenses charged beyond a reasonable doubt. This standard applies regardless of whether the evidence is direct or circumstantial. *People v. McLaurin*, 2020 IL 124563, ¶ 22.

¶ 60    The defendant's argument concerning the sufficiency of the evidence has two components. First, he argues that the evidence was insufficient to prove beyond a reasonable doubt that he participated in the conduct charged at all. More precisely, he contends that the evidence was insufficient to demonstrate that the man dressed in black clothing was him. Second, the defendant argues that, assuming the State proved his identity, the evidence presented was not sufficient to prove each element of all three charged offenses beyond a reasonable doubt. This argument focuses on evidence that the defendant possessed both the cocaine and the weapon at the pertinent time. We will consider these contentions in turn.

18

¶ 61                                      1. Evidence of Identity

¶ 62    First, the defendant correctly contends that the State must prove beyond a reasonable doubt the identity of the person who committed the charged offenses. See *People v. Smith*, 2015 IL App (1st) 132176, ¶ 18. As stated earlier, the question in this case was whether the evidence was sufficient to prove the defendant was the man in black clothing seen by Conner and captured on video at the scene. He argues that the evidence was not sufficient, and that the State thus failed to carry its burden in this regard. We disagree.

¶ 63    The defendant first emphasizes that no witness testified to seeing him at the scene. As the State points out, however, the officers' investigation was initially focused on the shooting and on interviewing the resident of the house involved. Officers learned only later that a witness (Conner) reported seeing two men exit the home and run behind a house across the street. It is thus not surprising that no officer testified to seeing the defendant at the scene.

¶ 64    The defendant further emphasizes that, although some of the officers who testified were familiar with him from previous encounters,[5] none identified him on the videos. The defendant is correct that such testimony is generally admissible. See *People v. Thompson*, 2016 IL 118667, ¶ 59. He is also correct that the testimony of someone familiar with defendant, including a police officer, might be helpful to the jury in identifying him in a photograph or video image. See *id.* ¶ 65 (explaining that where a police officer was familiar with the defendant from prior encounters, he was "more likely to correctly identify defendant [in a blurry photograph] than the jury"). It is worth noting that identification testimony from a police officer has the potential to invade the province of the jury or otherwise prejudice defendant. As such, although such testimony is admissible,

---

[5]Carpenter testified at trial that he knew the defendant from previous encounters. Griffet testified at the preliminary hearing that she was familiar with the defendant from prior encounters.

certain cautionary procedures must be followed. *Id.* ¶¶ 55-59. More importantly, while identification testimony from an officer familiar with the defendant might have strengthened the State's case here, we do not believe the lack of such testimony requires reversal. The jury was able to view the videos and compare the videos to the defendant. The jury was also able to consider additional circumstantial evidence in deciding whether the State had proven the defendant was one of the individuals who had committed the offenses.

¶ 65    The defendant next argues that the quality of the images captured on the video recordings was too poor to allow for a valid comparison with the booking photograph. He argues that this problem was compounded by the fact that the man in the video recordings was wearing a baseball cap, while he was not wearing a cap in his booking photograph. He explains that the cap hides "key identifying characteristics such as head shape and hair pattern" from the video image. In addition, the defendant points out that the booking photograph does not show his whole body, only his head and shoulders, thereby preventing jurors from comparing the build of the man on the video with the defendant. We are not persuaded.

¶ 66    We agree that it is virtually impossible to discern any facial features on the security camera footage. However, the footage from Griffet's dash cam offers a much closer view of the man in black clothing. While the image quality is far from perfect, it is adequate to allow jurors to see the general shape of the man's face and to determine the extent to which he bears a resemblance to the defendant. In addition, while the booking photograph shows only the defendant's head and shoulders, jurors could compare the build of the man they saw in the video with the defendant's build based upon seeing him in court. Moreover, the jury was not required to definitively identify the defendant based on the video footage alone; rather, they had to consider the footage along with additional evidence such as the DNA on the Ruger handle.

¶ 67     Next, the defendant challenges testimony concerning the height of the man seen in Griffet's dash cam footage. As discussed above, the man appeared to be roughly the same height as the vehicle that picked him up. There was testimony that the vehicle was between five feet five and one-half inches high and five feet seven inches high; and there was testimony that the defendant was five feet and seven inches tall. He argues that the precise height of the vehicle was not clearly established and that the quality of the video from Griffet's dash cam was not high enough to allow jurors to compare the height of the man and the vehicle. We are not persuaded.

¶ 68     While we agree that the evidence did not clearly establish the exact height of the vehicle, the testimony concerning the vehicle height and the footage showing the man in black clothing approaching the vehicle was adequate to enable the jurors to determine whether the man in the video was close to five-foot-seven. Standing alone, this would not have been sufficient to prove the defendant's identity beyond a reasonable doubt; however, this was but one piece of evidence tending to show that the man seen on the videos was the defendant.

¶ 69     The defendant next challenges the strength of the DNA evidence. The defendant correctly notes that the forensic scientist testified that she could not determine how or precisely when defendant's DNA got on the Ruger handle. She explained that DNA could last on an object for up to four to six weeks. In addition, while she testified that typically, DNA would not be found on an object unless a person had handled it more than once, she also acknowledged that DNA could be transferred to an object through a sneeze or a cough, even if the person never touched it. While the DNA evidence, standing alone, does not definitively establish that the defendant handled the gun in the vicinity of 3002 Ridgewood Court on November 10, 2020, the DNA evidence considered along with all the other evidence was sufficient to allow the jury to conclude beyond a reasonable doubt that the defendant was the man in black clothing seen on the video recordings.

21

¶ 70　　Finally, the defendant argues that even considering the evidence cumulatively is "not enough to overcome the reasonable doubt inherent in each of them separately." Our review of the record, including the above evidence, demonstrates that the totality of the evidence was sufficient to allow the jury to conclude beyond a reasonable doubt that the defendant was the man in black clothing seen on the video. Therefore, we turn our attention to the defendant's contentions regarding the elements of the specific offenses charged.

¶ 71　　　　　　　　　2. Possession of Cocaine with Intent to Deliver

¶ 72　　The defendant next argues that, assuming the evidence was sufficient to establish that he was the man in black clothing who appeared in the video recordings, the State failed to present proof beyond a reasonable doubt that he had possession of the cocaine. We disagree.

¶ 73　　To prove the defendant guilty of possession with intent to deliver, the State was required to prove beyond a reasonable doubt that: (1) the defendant had knowledge of the presence of the cocaine, (2) he had control or possession of the cocaine, and (3) he had the intent to deliver it. *Minniweather*, 301 Ill. App. 3d at 578. Possession can be actual or constructive. *Hilson*, 2023 IL App (5th) 220047, ¶ 58. Actual possession does not require physical touching of contraband; it merely requires an individual to exercise present personal dominion or control over it. *Id.* Constructive possession exists when, even though the defendant does not have actual, personal, present dominion over the contraband, he has knowledge of its presence and control over the area where it is found. *Id.* Evidence of constructive possession is often entirely circumstantial. *Minniweather*, 301 Ill. App. 3d at 580. Similarly, because intent is a mental state, which is rarely subject to direct evidence, intent to deliver ordinarily must likewise be inferred from circumstantial evidence. *People v. Greer*, 336 Ill. App. 3d 965, 975-76 (2003).

¶ 74    The defendant contends that the evidence was insufficient to demonstrate that he had either actual or constructive possession of the cocaine. He further contends that the evidence was insufficient to prove that he was accountable for the conduct of Tate. We are not persuaded.

¶ 75    With respect to evidence of actual possession, the defendant argues that there was no evidence he ever exercised personal control or dominion over the cocaine. He emphasizes that no witness testified to observing the man in black clothing carrying the drugs and that the video footage likewise did not show him carrying any objects. He further points out that the video footage did not provide any visual indication that the man in black clothing was carrying anything—for example, there was no visible bulge in his clothing and no objects protruding. He also argues that he never had exclusive access to the items found behind 3003 Ridgewood Court because Tate was with him.

¶ 76    We agree that the evidence was insufficient to prove that the defendant ever personally touched the cocaine. There was no physical evidence, such as fingerprints or DNA samples, linking the items in the white plastic bag to any individual and, as the defendant correctly states, there was no direct evidence that he carried those items across the street. However, as explained earlier, actual possession does not require that an individual physically touch the drugs. *Hilson*, 2023 IL App (5th) 220047, ¶ 58. The evidence showed that the drugs were carefully hidden under a rug, which was weighed down by rocks and covered with a tarp, and additional evidence showed that the defendant remained behind 3003 Ridgewood Court for four minutes after Tate left. The jury could reasonably infer from this evidence that the defendant had the requisite knowledge of the cocaine's presence and intent to exercise control over it necessary to find that he possessed it.

¶ 77    Moreover, it was not necessary for the State to prove that the defendant personally had actual possession of the cocaine because the evidence in this case was sufficient to support a

finding of constructive possession. See *Minniweather*, 301 Ill. App. 3d at 578. In support of his argument to the contrary, the defendant calls our attention to *Minniweather*, a case he contends is distinguishable from the case before us. While we agree that *Minniweather* is not precisely analogous to the case before us, we do not believe it is wholly distinguishable either.

¶ 78    In *Minniweather*, two patrol officers saw a man later identified as the defendant engaging in an interaction with the passenger of a vehicle. *Id.* at 576. They suspected the interaction was a drug sale. *Id.* When the officers approached him, the defendant fled. *Id.* Two other officers, responding to a call for backup, found the defendant crouching along the side of a nearby house. *Id.* They lost sight of him but later found him hiding under a table on the patio of the same house. *Id.* The officers repeatedly told the defendant to come out of his hiding place with his hands visible, but he refused to do so. *Id.* After the defendant was arrested, officers searched the area. *Id.* Approximately five or six feet from the defendant's hiding place, they found a plastic bag containing several baggies of cocaine and $222 in cash. *Id.* at 576-77.

¶ 79    As in this case, there was no direct evidence that anyone saw defendant in possession of the cocaine. *Id.* at 580. In rejecting defendant's sufficiency of the evidence challenge, however, the appeals court found that "the circumstantial evidence supporting a finding of possession [was] strong." *Id.* In reaching this conclusion, the court highlighted the evidence and noted that no one else was seen in the vicinity and that there was no evidence that the house where the cocaine was found was a "drug house." *Id.* The court held that this evidence gave rise to a reasonable inference that the defendant "intended to exercise control over the cocaine and, thus, it was in his possession." *Id.*

¶ 80    The defendant argues that the evidence in this case is not as strong as the evidence in *Minniweather*. He correctly points out that no witness observed him engaging in an actual or

24

suspected drug transaction. He further contends that the instant case is distinguishable from *Minniweather* because, unlike that case, there was no evidence he fled from police, and no evidence that he was alone where the drugs were discovered. We find these arguments unavailing.

¶ 81    We first note that the defendant's arguments concerning the differences between the cases mischaracterize some of the evidence. Contrary to the defendant's assertion, the evidence shows that he *did* flee from the scene after he emerged from behind 3003 Ridgewood Court. In addition, although there was no direct evidence that any witness saw the defendant a few feet from where the cocaine was found, there was circumstantial evidence that he was alone in the backyard of 3003 Ridgewood Court for four minutes after Tate emerged.

¶ 82    Nevertheless, the evidence in this case was not as strong as that in *Minniweather*. As discussed, there was no evidence in this case that anyone observed the defendant or Tate engaging in a suspected drug transaction, and while there was circumstantial evidence from which the jury could infer that the defendant was alone with the drugs and weapons behind 3003 Ridgewood Court, this was not as strong as the evidence that officers actually saw the defendant in *Minniweather* hiding mere feet from where they found the drugs shortly after arresting him.

¶ 83    However, other evidence in this case is quite similar to the evidence in *Minniweather*. There was circumstantial evidence showing that the defendant and Tate went behind 3003 Ridgewood together, that Tate emerged three minutes later, and that the defendant emerged four minutes after Tate. As in *Minniweather*, there was no evidence that 3003 Ridgewood Court was a "drug house." Indeed, the fact that the resident permitted officers to search the backyard indicates they were unaware of the presence of the drugs and weapons hidden there. This evidence is sufficient to allow a reasonable jury to infer that the drugs did not belong to the residents of 3003 Ridgewood, that they were brought there by the defendant and/or Tate, and that the defendant

25

exercised exclusive control and dominion over the drugs for a period of four minutes after Tate returned to the front yard of 3002 Ridgewood Court. It is therefore sufficient to support a finding of constructive possession.

¶ 84     In addition, we find the evidence sufficient to support a finding of guilt by accountability for the conduct of Tate. An individual is legally accountable for the conduct of another if he solicits, aids, or abets, or agrees or attempts to aid in the commission of an offense with the intent to promote or facilitate the crime. *People v. Taylor*, 164 Ill. 2d 131, 140 (1995). A defendant may be accountable if he shared the criminal intent of the other individual or if they shared a common plan or purpose. *Id.* at 140-41. Active participation is not a requirement for guilt under a theory of accountability; however, presence at the scene of a crime coupled with knowledge that the crime is being committed is insufficient without more. *Id.* at 140.

¶ 85     In support of his contention that the State failed to establish these elements, the defendant asserts that the State presented no evidence that he and Tate planned the offenses in advance. Although this is true, words of agreement are not required to prove a common purpose. *Id.* at 141. Moreover, the agreement can occur before *or during* the commission of the offense. *Id.* at 140.

¶ 86     An agreement or common purpose can be inferred from the surrounding circumstances. *Id.* at 141. Pertinent factors include presence at the scene, failure to report the crime, fleeing the scene, and maintaining a close affiliation with other involved individuals after the crime. *Id.* Here, the evidence shows that the defendant was present at the scene, did not report the crime, and fled the scene. Although there was no evidence concerning any further affiliation between the defendant and Tate after the events at issue, the video recordings showed that they left the scene together. Further, the defendant's DNA was found on the handle of one of the weapons, which constitutes strong circumstantial evidence that he was an active participant. We conclude that this evidence,

26

taken together and viewed in the light most favorable to the State, was sufficient to establish that the defendant and Tate were acting together with a common purpose. Thus, assuming Tate carried the cocaine across the street and hid it under the rug and tarp, the evidence was sufficient to find the defendant guilty pursuant to a theory of accountability.

¶ 87                    3. Armed Violence and Armed Habitual Criminal

¶ 88    The defendant's final argument concerning the sufficiency of the evidence revolves around possession of the Ruger handgun, a necessary element of both the armed violence and armed habitual criminal charges. To support a conviction for armed violence, the State must prove that a defendant committed one of the enumerated felonies, which included possession of narcotics with intent to deliver, " 'while armed with a dangerous weapon.' " *People v. Curry*, 2018 IL App (1st) 152616, ¶ 17 (quoting 720 ILCS 5/33A-2(a) (West 2012)). A handgun, such as the Ruger involved in this case, is considered a "dangerous weapon" for purposes of the statute. *People v. Smith*, 191 Ill. 2d 408, 411 (2000). Illinois courts have held that the requirement of being armed during the commission of an enumerated offense is satisfied if the defendant has a weapon on or about his person or is "otherwise armed," and being "otherwise armed" means having immediate access to or control over the weapon. See *id.* at 412; *Curry*, 2018 IL App (1st) 152616, ¶¶ 19-20. To support a conviction for being an armed habitual criminal, the State must prove that the defendant knowingly possessed a firearm after having been convicted previously of two or more qualifying offenses. *Hilson*, 2023 IL App (5th) 220047, ¶ 49.

¶ 89    The defendant argues that the evidence was insufficient to prove the element of possession for either offense. He further contends that, assuming the State satisfied its burden of proving possession, it failed to establish that he was in possession of the Ruger while committing the

27

offense of possession of cocaine with intent to deliver, as it was required to do to support a conviction for armed violence. We reject both claims.

¶ 90     With respect to possession of the Ruger, the defendant's arguments are essentially identical to his arguments regarding possession of the cocaine, which we have already rejected. For the reasons already discussed, the evidence was sufficient to allow the jury to reasonably infer that the defendant and Tate acted together in carrying the five weapons and the cocaine across the street and hiding them under the tarp. Our rationale applies with equal force to the Ruger. We note that, if anything, the evidence of possession was stronger for the Ruger than for the cocaine. The defendant's DNA was found on its handle. This evidence was sufficient to prove beyond a reasonable doubt that the defendant had possession of the Ruger.

¶ 91     We turn our attention to the defendant's arguments concerning the sufficiency of the evidence that he was in possession of the Ruger *while* committing the offense of possession of cocaine with intent to deliver. In contending that the evidence of simultaneous possession was insufficient to support his conviction for armed violence, the defendant calls our attention to the Illinois Supreme Court's decision in *People v. Smith* and the First District's decision in *People v. Curry*, each of which discuss the requirement that a defendant be armed while committing one of the enumerated felonies.

¶ 92     In *Smith*, police went to defendant's apartment to execute a search warrant. *Smith*, 191 Ill. 2d at 410. As they approached his building, they saw defendant drop a handgun out of his window. *Id.* Officers later recovered the gun and discovered that it was not loaded. *Id.* When they searched defendant's apartment, officers found cannabis and cocaine, but they did not find any ammunition. *Id.* After a bench trial, defendant was found guilty of various charges, including armed violence. *Id.*

28

¶ 93    On appeal, defendant argued that the State failed to prove him guilty of armed violence. *Id.* Significantly, the underlying facts were not in dispute (*id.* at 411), and the focus of the supreme court's analysis was not the strength of the evidence but, rather, whether the undisputed facts fit within the statutory definition of "while armed" (*id.* at 411-13). In answering this question, the court explained that in interpreting the phrase "otherwise armed" in its previous cases, it had focused on the purpose of the armed violence statute—which was deterring "felons from using dangerous weapons, thereby minimizing the deadly consequences which may result when a felony victim resists." *Id.* at 411-12. The court further explained that this goal of the statute was implicated only when a defendant had immediate access to a weapon, timely control over a weapon, or the intent and ability to maintain control or possession of the weapon. *Id.* at 412. The court found that these requirements were not satisfied under the facts before it, where the defendant discarded an unloaded gun before police arrived. *Id.* at 412-13.

¶ 94    In *Smith*, the court focused on whether defendant was armed at the time of his arrest. See *id.* at 416 (Miller, J., concurring in part and dissenting in part) (criticizing the majority for treating the time of arrest as dispositive). In *Curry*, however, the First District emphasized that the armed violence statute applied if a defendant was armed either during the commission of a felony or during a subsequent confrontation with police. *Curry*, 2018 IL App (1st) 152616, ¶ 18. The *Curry* court reached this conclusion after reviewing *Smith* and other Illinois Supreme Court precedents. *Id.* ¶¶ 19-20.

¶ 95    In *Curry*, police officers observed defendant throwing away drugs and a loaded gun as he fled. *Id.* ¶ 22. Two officers testified that defendant told them he carried a gun for protection, although defendant denied making this statement during his own testimony. *Id.* ¶¶ 6, 9. The

29

appellate court found this evidence to support a finding that defendant carried a loaded weapon while selling drugs. *Id.* ¶ 22.

¶ 96 Here, the defendant contends that the evidence that he was armed with the Ruger while committing the offense of possession with intent to deliver was "even thinner" than the evidence in both *Smith* and *Curry*. We find *Smith* distinguishable from the facts at hand, because it contained no discussion of the time of the felony itself. See *Smith*, 191 Ill. 2d at 411-13; *Curry*, 2018 IL App (1st) 152616, ¶ 18.

¶ 97 While we acknowledge that the evidence in *Curry* was stronger than the evidence here, we nevertheless believe that the evidence in this case was sufficient to prove beyond a reasonable doubt that the defendant was armed with the Ruger while he was in possession of the cocaine. As noted above, the evidence gave rise to a reasonable inference that the defendant and Tate carried all the items found under the tarp across the street simultaneously, including the cocaine and the Ruger. Moreover, even assuming they were carried across at different times, the jury could have reasonably inferred that the defendant had constructive possession of the items found there for several minutes prior to emerging from behind 3003 Ridgewood Court and leaving the scene with Tate.

¶ 98 The defendant argues that there are innocent explanations for this evidence. However, we are not required to search for all possible inferences consistent with innocence. *Hilson*, 2023 IL App (5th) 220047, ¶ 51. In addition, evidence need not be overwhelming to be sufficient to support a conviction. See *McLaurin*, 2020 IL 124563, ¶ 32. We conclude that the evidence presented was sufficient to prove beyond a reasonable doubt that the defendant was the man in black clothing and that he committed all essential elements of the offenses charged.

¶ 99                               B. Closing Argument

¶ 100   Next, the defendant points to several statements in the State's closing argument and contends that these statements deprived him of a fair trial. He acknowledges that his defense counsel did not object to these remarks at trial. However, he urges us to consider his claims under the plain-error doctrine. The plain-error doctrine allows appellate courts to review claims of error a party has forfeited through failure to object at trial under two sets of circumstances. Plain-error review is appropriate "when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). The first step in plain-error analysis, however, is to determine whether an error occurred at all. *People v. Short*, 2020 IL App (1st) 162168, ¶ 66. We also note that defense counsel's failure to object to improper argument is part of the defendant's claim of ineffective assistance of counsel. As such, it is appropriate to determine whether any improper closing remarks would have warranted reversal in order to resolve that claim, regardless of whether such improper closing remarks rose to the level of plain error. With this in mind, we turn our attention to the applicable law governing closing arguments.

¶ 101   Closing arguments provide parties' attorneys an opportunity to review the evidence with the jury, discuss what that evidence means, explain how the law applies to the evidence, and argue why the evidence and applicable law should lead jurors to reach a favorable verdict. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005) (citing T. Mauet & W. Wolfson, Trial Evidence 439 (2d ed. 2001)). Prosecutors may comment on the evidence presented at trial as well as any reasonable inferences that can be drawn from that evidence. *Id.* However, a prosecutor may not argue assumptions or facts that are not based on the evidence. *People v. Stevens*, 2018 IL App (4th) 160138, ¶ 56. Prosecutors have wide latitude in closing arguments. *Id.*; *People v. Williams*, 333

31

Ill. App. 3d 204, 214 (2002). However, they must refrain from making arguments that serve no purpose other than to inflame the passions of the jurors. *Nicholas*, 218 Ill. 2d at 121.

¶ 102   Closing arguments must be viewed in their entirety, and challenged remarks must be read in context. *Id.* at 122. Reversal is only required if the challenged remarks were a material factor in the defendant's conviction. In other words, we will reverse only if the jury may have reached a different verdict without the improper comments. *People v. Smith*, 2012 IL App (1st) 102354, ¶ 47, *superseded by statute on other grounds, as recognized in People v. Phelan*, 2019 IL App (1st) 053031.

¶ 103   The defendant first challenges remarks referring to him as a drug dealer and to 3002 Ridgewood Court as a "drug house." Such remarks are not improper if they are based on evidence. *People v. James*, 2021 IL App (1st) 180509, ¶ 42. Here, there was evidence showing that the defendant and Tate hid a large quantity of cocaine along with a digital scale and five firearms. Carpenter, the State's expert witness, testified that this evidence was consistent with a drug-selling "operation." As such, referring to the defendant as a drug dealer was not improper.

¶ 104   Regarding the prosecutor reference to 3002 Ridgewood Court as a "drug house," the defendant correctly notes that there was no direct evidence of any specific drug-related activities occurring inside the house. However, there was evidence that the two men who hid the drugs, weapons, and digital scale across the street emerged from inside the house prior to doing so. Conner testified that she saw them exit the house. In addition, there was evidence that the resident of the house was uncooperative when police questioned her about the shooting. There was also undisputed evidence that shots were fired at the house on the date in question. The defendant complains that the "scant evidence" concerning his vehicle being found in front of the house three months earlier was likewise used to support this conclusion. He asserts that there was no direct

evidence that the vehicle had been deliberately set on fire, nor was there evidence as to how or why the vehicle came to be parked there. While we agree the evidence does not conclusively establish that either the earlier incident involving the defendant's vehicle or the shooting on the date in question were the result of drugs being sold from 3002 Ridgewood Court, we believe that was a reasonable inference the prosecutor could argue. Taken together, the evidence permitted an inference that the house in question was a "drug house."

¶ 105   Next, the defendant challenges the prosecutor's remarks about the testimony of Amii Webb. In particular, defendant points to the prosecutor's argument that because Webb testified that he had "no legitimate means of income" at the time the events at issue occurred, he was a drug dealer rather than "a humble babysitter." We agree that the prosecutor misstated the evidence when he argued that Webb testified the defendant had "no legitimate means of income." Webb testified that she did not know how the defendant was supporting himself. She explained that she and the defendant coparented their children, and this that was her "only concern." It is never proper for a prosecutor to misstate the evidence. *Stevens*, 2018 IL App (4th) 160138, ¶ 56.

¶ 106   Here, however, the jury was instructed both before and after closing arguments that the statements of the attorneys were not evidence, and the jury was told to disregard any statements that were not consistent with the evidence. This served to mitigate any prejudice from the improper remarks. See *Nicholas*, 218 Ill. 2d at 122-23; *People v. Desantiago*, 365 Ill. App. 3d 855, 865 (2006). We acknowledge that curative instructions are not always sufficient to overcome the prejudicial effect of improper closing remarks. *People v. Abadia*, 328 Ill. App. 3d 669, 678 (2001). Here, Webb was the final witness to testify, so her testimony was fresh in the jury's minds when it heard the challenged remarks. It is also worth noting that the prosecutor himself told the jury that the focus of its inquiry was on the narrow question of whether the defendant committed the

33

three charged offenses. We find that the curative instructions adequately mitigated the potential prejudice.

¶ 107   The defendant also challenges remarks referring to him as a "humble babysitter." As he correctly emphasizes, Webb testified that he was caring for his own children when the events at issue transpired. He argues that referring to this as babysitting is problematic because it suggests that he viewed caring for his children as "transactional," something he argues plays into negative stereotypes about African American fathers, and also because it created a "false dichotomy" between "humble babysitters" and drug dealers. We are not persuaded.

¶ 108   We agree that it is factually inaccurate to refer to a father caring for his own children as a "babysitter." Nevertheless, this is not an uncommon mischaracterization. The jury is not required to leave its common sense at the door or ignore matters of common experience. See *People v. Anderson*, 2018 IL App (4th) 160037, ¶ 52. We believe the jury likely understood that it was the prosecutor, not the defendant, who was characterizing the defendant's care of his own children as babysitting, particularly in light of Webb's recent testimony that she and the defendant coparented their children. See *Desantiago*, 365 Ill. App. 3d at 868 (explaining that references to defense counsel as a "professional defense attorney" were not pejorative because the jury likely understood that the attorneys on both sides were professionals). Any negative inferences the jury might have drawn from the prosecutor's use of the term "babysitter" are purely speculative.

¶ 109   The defendant next argues that the prosecutor overstated the strength of some of the evidence. He first highlights the prosecutor's comments comparing the defendant's physical features to those of the man dressed in black clothing seen in the video footage. In particular, he challenges remarks stating that they have the same height, the same build, and the same facial features. The quality of the images captured by the video was not high. It was difficult to clearly

discern the exact facial features of the man seen in the footage. However, it was possible for jurors to see his body type and the general shape of his face compared to those of the defendant, and it was likewise possible to determine his approximate height relative to the vehicle that picked him up. To the extent that the prosecutor's remarks concerning specific facial features implied they were more definitive than they were, we do not find the suggestion prejudicial enough to have warranted reversal. It is worth noting that the prosecutor made these remarks while playing a video for the jury. The jury was thus able to determine for themselves whether the video footage showed what the prosecutor argued it did.

¶ 110    The defendant next points to the prosecutor's statement that the man in black clothing in the video footage was "clearly" armed as he ran across the street because his pants were weighed down by guns in his pockets. He argues that this was not at all clear from the footage. We believe this was a reasonable inference the prosecutor could argue from the evidence that the defendant was holding his waist. We will not find the argument improper simply because the prosecutor added the adverb "clearly," particularly in light of the fact that, as discussed earlier, there was additional circumstantial evidence to support the finding that the defendant was armed.

¶ 111    The defendant further asserts that the prosecutor overstated the value of the DNA evidence by referring to the DNA sample found on the Ruger handle as a "match" for the defendant's DNA. We disagree. The statistical likelihood of the partial DNA sample found on the Ruger belonging to any individual was 1 in 53 quintillion, making the odds that it was not the defendant's DNA infinitesimally small. Thus, we find no error. See *Smith*, 2012 IL App (1st) 102354, ¶ 56 (finding it proper to refer to a partial DNA sample found on a weapon as "the defendant's DNA" where the expert concluded that 91% of the population could be excluded as a contributor, but the defendant was not in that 91%).

35

¶ 112 We also note that the case the defendant relies upon in support of his contention that referring to the DNA as a "match" was improper is distinguishable. In *People v. Jackson*, the State's DNA expert specifically testified that the partial DNA profile recovered from a bloodstain on the defendant's jeans could not be termed a "match" for the victim's DNA and that he could not say whether it was the victim's blood. *People v. Jackson*, 2020 IL 124112, ¶ 54. He testified to the probabilities of the partial profile occurring in unrelated individuals who were African-American, Caucasian, and Hispanic. Those probabilities, while small, were substantially higher than the 1 in 53 quintillion probability in this case. *Id.* It is worth noting that the DNA expert in *Jackson* also explained that a DNA profile can only be called a "match" if the genetic information at 13 specific loci matches the information at those loci in the known profile. *People v. Jackson*, 2018 IL App (5th) 150274, ¶ 118, *aff'd*, 2020 IL 124112. Here, the DNA analyst was able to determine that the partial profile matched the defendant's known profile at 13 loci.

¶ 113 Finally, the defendant argues that the prosecutor improperly urged jurors to "send a message" by finding him guilty. We reject this contention.

¶ 114 Prosecutors may comment on the evils of crime generally and may exhort the jury to fearlessly administer justice. *Desantiago*, 365 Ill. App. 3d at 864. However, the problems of crime in the community should not be the focus of the jury's attention. *Stevens*, 2018 IL App (4th) 160138, ¶ 64. As the defendant correctly contends, it is not proper for prosecutors to urge the jury to "send a message" to the community at large or to a particular group, such as crime victims or law enforcement. *Id.* ¶ 68; *Desantiago*, 365 Ill. App. 3d at 865. It is also improper to ask the jury to focus on the message the verdict might send to "others like the defendant." *Desantiago*, 365 Ill. App. 3d at 865. However, it is not improper to urge the jury to send a message to the defendant.

*Id.* Here, the prosecutor made two isolated comments urging the jury to send a message to the defendant. We find no error.

¶ 115   In summary, many of the remarks challenged by the defendant were proper and others, while improper, were not prejudicial enough to warrant reversal. Viewing the challenged remarks within the context of the closing arguments as a whole, we do not believe reversal would have been warranted had defense counsel made a timely objection or that the improper remarks were a material factor in defendant's convictions. Given that the evidence in this case is not as close as defendant suggests, any error is harmless.

¶ 116                           C. Ineffective Assistance of Counsel

¶ 117   The defendant's final contention is that he received ineffective assistance of counsel. He argues that his counsel was ineffective for (1) failing to protect him from the prejudicial effect of the evidence that his burned-up vehicle had been parked in front of 3002 Ridgewood Court, (2) calling Webb as a witness, and (3) failing to object to the closing arguments outlined above. We disagree.

¶ 118   We analyze claims of ineffective assistance of counsel under the two-part test established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). Under that test, a defendant must show both that (1) his attorney's performance was deficient, and (2) he was prejudiced and deprived of a fair proceeding as a result. *People v. Redmon*, 2022 IL App (3d) 190167, ¶ 19. To satisfy the first part of this test, a defendant must show that counsel's representation was objectively unreasonable. *People v. Lucious*, 2016 IL App (1st) 141127, ¶ 29. To do so, the defendant must overcome a strong presumption that counsel's decisions constituted sound trial strategy. *Strickland*, 466 U.S. at 689. In assessing counsel's performance, we must consider the totality of the circumstances. *Id.* at 688. We must consider counsel's performance as

37

a whole rather than focusing on isolated actions. *Redmon*, 2022 IL App (3d) 190167, ¶ 19. In addition, we must avoid viewing counsel's decisions through the lens of hindsight. *Lucious*, 2016 IL App (1st) 141127, ¶ 31.

¶ 119    To satisfy the second part of the *Strickland* test, the defendant must establish that he was prejudiced by counsel's deficient performance. *Id.* ¶ 45. This requires him to demonstrate a reasonable probability that, but for counsel's mistakes, the result of the proceeding would have been different. A reasonable probability is a likelihood sufficient to undermine confidence in the outcome of the defendant's trial. *Id.*

¶ 120              1. Caleb Rice's Testimony About the Defendant's Vehicle

¶ 121    The defendant first argues that counsel was ineffective in his handling of the State's evidence that his burned-up vehicle was found in front of 3002 Ridgewood Court three months before the events at issue took place. His argument has three components. First, he contends that counsel failed to object to this prejudicial evidence. Second, he argues that the prosecutor asked the jury to infer from this evidence that he had committed other drug crimes, and that, as such, counsel was ineffective for failing to request the type of limiting instruction ordinarily provided when other-crimes evidence is admitted. Third, the defendant contends that counsel elicited harmful testimony during his cross-examination of Caleb Rice, the officer who testified about towing his vehicle. We will address these contentions in turn.

¶ 122    The defendant correctly contends that effective representation requires defense counsel to use the rules of evidence " 'to shield an accused from a decision based on unreliable evidence.' " *People v. McMillin*, 352 Ill. App. 3d 336, 344 (2004) (quoting *People v. Lefler*, 294 Ill. App. 3d 305, 310 (1998)). It is important to note, however, that effective assistance does not require an attorney to make objections or motions that would not be successful. *People v. Moore*, 2012 IL

38

App (1st) 100857, ¶ 45. Objecting to admissible evidence would be a futile act. *Lucious*, 2016 IL App (1st) 141127, ¶ 33. Thus, to determine whether the defendant's attorney in this case was ineffective for failing to object to the admission of Rice's testimony about his vehicle, we must first consider whether that evidence was admissible.

¶ 123   All relevant evidence is generally admissible, and a piece of evidence is relevant if it has any tendency to make any fact at issue more or less likely than it would be without the evidence. *People v. Stowe*, 2022 IL App (2d) 210296, ¶ 50. Here, the defendant argues that evidence concerning his car was not relevant because it was not probative of his actions or presence at the scene three months after the vehicle was towed. We disagree. Evidence that the defendant had a prior connection to the house made it at least somewhat more likely that he was there on the date in question.

¶ 124   However, even relevant evidence should be excluded if its probative value is substantially outweighed for the potential for unfair prejudice. *Id.* ¶ 51. The defendant contends that the evidence was highly prejudicial because the State used it to argue that he had been involved in previous drug transactions. Specifically, the State argued that babysitters did not have their cars burned up outside drug houses but that drug dealers did. The test, however, is not whether there is any potential for unfair prejudice, but rather, whether that potential *substantially* outweighs the probative value of the evidence. *Id.* Here, the probative value of the evidence and the potential for unfair prejudice were limited for precisely the same reasons—namely, there were no details concerning the earlier incident, and the jury was reminded by both attorneys that the issue before them was limited. The State argued that the narrow issue was whether the defendant committed the three charged offenses, while the defense attorney argued that the only issue was the events of November 10, 2020. This evidence was admissible, and an objection would have been futile.

39

¶ 125   The defendant contends, however, that the State's argument inferring that he was a drug dealer based, in part, on evidence of the burned-out vehicle, transformed the evidence into evidence of a prior offense. Evidence of other crimes or other bad acts is not admissible for the purpose of demonstrating a defendant's propensity to commit crimes. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). However, such evidence is admissible if it is relevant for another purpose unless the potential for unfair prejudice substantially outweighs its probative value. *Id.* at 365. The potential for prejudice can be reduced by instructing the jury that it may only consider other-crimes evidence for the limited purpose for which it was introduced. See *id.* at 376.

¶ 126   This brings us to the defendant's next contention—he argues that counsel was ineffective for failing to request a limiting instruction. We are not convinced. Although the prosecutor did argue that having a burned-up car parked in front of a "drug house" was something "drug dealers do," an argument the State acknowledges may have "painted with too broad a brush," he did not specifically argue that the jury could infer that the defendant committed any specific offense on any prior date. In short, Rice's testimony did not constitute other-crimes evidence for which a limiting instruction would have been warranted. Consequently, counsel cannot be found ineffective for failing to request such an instruction.

¶ 127   The defendant's final contention regarding Rice's testimony concerns cross-examination. He argues that counsel was ineffective for eliciting testimony that the vehicle "was potentially involved in a shooting." We are not persuaded.

¶ 128   As we explained earlier, we must consider counsel's performance as a whole and avoid assessing his decisions with the benefit of hindsight. See *Redmon*, 2022 IL App (3d) 190167, ¶ 19; *Lucious*, 2016 IL App (1st) 141127, ¶ 31. It is therefore essential that we set forth the context in which this testimony was elicited.

¶ 129   Counsel began his cross-examination of Rice by asking why he was called to the scene. In particular, he asked whether Rice was responding to a call about a vehicle that was on fire. The following exchange then took place:

"A. No, sir, just that it was parked in this area, unoccupied. It was burned out, and it was potentially involved in a shooting.

Q. Well, that wasn't the car, though, that got—that wasn't the car that actually was the—at issue, was it?

A. I don't know. I just went to tow it.

Q. Right, you just went to tow one car, and you don't know anything about the actual car that was involved in the event that you've just testified to, correct?

A. That's correct."

Counsel went on to elicit further testimony from Rice acknowledging that he did not interview the defendant in connection with the August 2020 incident, that he knew nothing other than that the defendant's vehicle was towed from the scene at that time, and that he had no knowledge of the defendant's vehicle at any time other than August 25, 2020.

¶ 130   To the extent counsel's initial question regarding the substance of the call was open-ended enough to elicit unanticipated testimony, we must emphasize that a defendant is entitled to competent representation, not perfect representation. *Moore*, 2012 IL App (1st) 100857, ¶ 43. Moreover, viewed in context, the cross-examination of Rice constituted a reasonable attempt to limit the potential prejudice from the evidence that the defendant's vehicle was towed from the scene by showing that Rice had no knowledge that the defendant or his vehicle were involved in any criminal activity at that time. The presumption that counsel's decisions amounted to sound trial strategy can be overcome only if no reasonably effective criminal defense attorney would

41

engage in similar conduct under the same circumstances. *McMillin*, 352 Ill. App. 3d at 344. We do not find that standard is satisfied here.

¶ 131   It is also worth noting that the isolated statement was never referred to again by either party. As such, even if we agreed that counsel was objectively unreasonable for inadvertently eliciting this isolated statement, we could not find that the defendant suffered prejudice as a result. See *Lucious*, 2016 IL App (1st) 141127, ¶ 45.

¶ 132                               2. Amii Webb's Testimony

¶ 133   The defendant next argues that counsel was ineffective for calling Webb as a witness. We disagree. Decisions as to which witnesses to call are matters of trial strategy and are generally immune to claims of ineffective assistance of counsel. *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 79; see also *People v. Levesque*, 256 Ill. App. 3d 639, 644 (1993). The strategic value of Webb's testimony that the defendant was caring for their children when the events at issue took place is obvious. Indeed, as the State points out, failure to call an alibi witness can often amount to ineffective assistance. See, *e.g.*, *People v. King*, 316 Ill. App. 3d 901, 916 (2000).

¶ 134   Here, however, the defendant contends that Webb was an unreliable witness, a danger of which counsel should have been aware because she had written the wrong date on her written statement in support of him. He further contends that, in addition to failing to provide him with a solid alibi, Webb's testimony that he did not provide her with financial support was harmful and set up the State's arguments about the dichotomy between a "humble babysitter" and a drug dealer. In this regard, the defendant argues that this case is analogous to *Levesque*, a case where the appellate court found that counsel's assistance was objectively unreasonable. *Levesque*, 256 Ill. App. 3d at 645. We find the case distinguishable.

¶ 135   In *Levesque*, an alibi witness (the defendant's girlfriend) testified that she was with defendant on the night of the offense at issue until approximately 1 a.m. or 1:30 a.m. *Id.* at 642, 644. However, other evidence placed defendant at the crime scene beginning at 3:30 in the morning. *Id.* at 644. In addition, defendant's girlfriend testified on cross-examination that defendant had threatened to harm her if she did not testify that she was with him until approximately 6:45 or 7:30 that morning. *Id.* at 642, 644.

¶ 136   On appeal from his conviction, defendant in that case argued, much as the defendant does here, that counsel's decision to call his girlfriend constituted ineffective assistance of counsel because "her testimony not only accrued no benefit to him, but, in fact, did a disservice to his case." *Id.* at 644. In accepting this argument, the First District noted that although evidence of an attempt to intimidate a witness is admissible, defense counsel repeatedly demonstrated that he was unaware of this rule. *Id.* at 645. He argued that the testimony should be stricken on the grounds that it was irrelevant. *Id.* He subsequently argued in a motion for a new trial that admission of the testimony violated defendant's right to due process. *Id.* Further, the evidence showed that counsel was aware not only that the defendant had attempted to intimidate the witness but also that the threats had been reported to the police and prosecutors. *Id.* at 642.

¶ 137   The *Levesque* court explained that where an attorney's decision to call a witness is based "on a misapprehension of the law," that decision can constitute ineffective assistance. *Id.* at 644. The court found that, in light of the nature of the witness's testimony giving defendant only a "partial alibi" and harm from her testimony that defendant had threatened her, it was "not *** too much to expect that a reasonably competent attorney, that is, one who was aware that an attempt to intimidate a witness was admissible in a criminal trial, would not have put her on the stand." *Id.* at 645.

43

¶ 138    Here, Webb testified that the defendant was in her home caring for the children while she worked from 8 a.m. until 4 p.m. Unlike the alibi testimony in *Levesque*, her testimony provided him with a complete alibi. To be sure, there were credibility issues involving both Webb's memory of the relevant time frame, as illustrated by her use of the wrong date in her letter, and her potential motive to lie on the defendant's behalf because he was the father of her children. However, these potential credibility issues are quite different from the testimony at issue in *Levesque* which, even if believed, would not have given the defendant a complete defense.

¶ 139    Likewise, we do not consider Webb's testimony that the defendant did not provide her with financial support to be remotely similar to the testimony that Levesque had threatened to harm his girlfriend if she did not offer false testimony on his behalf. As the *Levesque* court explained, evidence of witness intimidation is relevant and admissible because it demonstrates a defendant's consciousness of guilt. *Id.* Testimony that a father does not provide financial support to the mother of his children, by contrast, does not tend to establish his consciousness of guilt or any element of the offenses charged. In addition, the testimony is not as damning as the testimony at issue in *Levesque*, especially considering Webb also testified that she coparented her children with the defendant. Moreover, there is no indication here that counsel's decision to call Webb involved a misapprehension of law. For these reasons, *Levesque* is distinguishable from the case before us. Defense counsel's decision to call Webb as a witness constituted sound trial strategy.

¶ 140                              3. Closing Argument

¶ 141    Finally, the defendant argues that counsel rendered ineffective assistance by failing to object to improper remarks made during the State's closing argument. We have already concluded that any improper remarks during the State's closing argument were not prejudicial enough to warrant reversal. As such, we cannot find that counsel's failure to object caused the type of

44

prejudice necessary to satisfy the *Strickland* test. *Jackson*, 2020 IL 124112, ¶ 91; *People v. Perry*, 224 Ill. 2d 312, 350 (2007). In addition, the decision not to object to improper remarks may have been a reasonable strategic choice to avoid calling attention to those remarks. See *People v. Leger*, 149 Ill. 2d 355, 396-97 (1992). We therefore reject the defendant's claim that counsel's decision not to object during closing arguments amounted to ineffective assistance of counsel.

¶ 142                                III. CONCLUSION

¶ 143    For the foregoing reasons, we affirm the defendant's Champaign County convictions.


¶ 144    Affirmed.